UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
HECTOR CHEBERE,                                      :

                              Petitioner,            :        04 Civ. 296 (LAP) (DF)

        -against-                                    :        **REPORT AND**
                                                              **RECOMMENDATION**
WILLIAM PHILLIPS,                                    :

                              Respondent.            :
----------------------------------------------------------------X

**DEBRA FREEMAN, United States Magistrate Judge:**

        This habeas proceeding was commenced in 2003[1] and has been on the Court's "suspense

docket" for most of the time since then, based on this Court's decisions to permit *pro se*

petitioner Hector Chebere ("Petitioner") to exhaust certain claims in the state courts before

proceeding with those claims here (*see* Orders, dated May 11, 2004 (Dkt. 6) (granting stay of

these proceedings), and June 8, 2006 (Dkt. 8) (continuing the stay)), and to amend his petition to

assert those additional claims following his efforts to exhaust them (*see* Order, dated Apr. 8,

2008 (Dkt. 15) (granting motion for leave to amend)); *see also* Amended Petition, dated Feb. 13,

2008 ("Am. Pet.") (Dkt. 13)).

        In his Amended Petition, Petitioner seeks a writ of habeas corpus pursuant to

28 U.S.C. § 2254, challenging his 1998 conviction in the Supreme Court of the State of New

York, Bronx County.  (*See* Am. Pet.)  Upon a jury verdict, Petitioner was found guilty of

murder, robbery, and kidnapping, based upon his alleged involvement in the killing of Damian

---

[1] Although the Petition was not docketed until January 15, 2004, Petitioner signed it on
September 6, 2003, and, where a *pro se* litigant is incarcerated at the time a suit is commenced,
the date on the pleading itself is generally considered the filing date.  *See Dory v. Ryan*, 999 F.2d
679, 682 (2d Cir. 1993) (*pro se* prisoner litigant's complaint considered "filed" as of date of
delivery to prison officials for transmittal to court), *modified on other grounds*, 25 F.3d 81
(2d Cir. 1994).

Blanding ("Blanding") on June 10, 1993, in New York City.  (*See id.*)  For these crimes, Petitioner was sentenced to 22 years to life imprisonment and is currently incarcerated at the Green Haven Correctional Facility in Stormville, New York.  (*See id.*)

## BACKGROUND

### A.   Petitioner's Trial

Petitioner was tried along with two co-defendants, Cesar Martinez ("Martinez") and Theodore Simpson ("Simpson"), in a three-week trial conducted in October 1998.  The alleged crimes, pre-trial proceedings and trial underlying Petitioner's conviction are accurately and thoroughly summarized in an Opinion and Order of the Court (Patterson, J.), denying the habeas petition of Petitioner's co-defendant and half-brother, Martinez, *see Martinez v. Phillips*, No. 04 Cv. 8617 (RPP), 2009 U.S. Dist. LEXIS 34847, at *2-25 (S.D.N.Y. Apr. 24, 2009), as well as in Petitioner's brief in support of the direct appeal of his conviction (Affidavit of Robert R. Sandusky, III, Esq., dated Sept. 8, 2008 ("Sandusky Aff.") (Dkt. 19), Ex. 7 (Brief for Defendant-Appellant, dated Aug. 1, 2001 ("Direct Appeal Mem.")), at 3-25).  The key facts relevant to this habeas proceeding are summarized below.

### 1.   The Prosecution's Case

#### a.   Testimony of Jose Caban

Jose Caban ("Caban"), who had a cooperation agreement under which he would not be prosecuted for the killing of Blanding if he served as a cooperating witness at Petitioner's trial, testified that, in April 1993, he acquired approximately $15,000 worth of heroin to sell and asked Petitioner to "cut" the heroin to prepare it for sale.  (*Id.* at 6-7.)  According to Caban, after Petitioner cut the heroin, Petitioner and Caban tried to sell it in New York City, but were generally unsuccessful.  (*Id.* at 7.)  Caban testified that, after a few weeks of slow sales,

2

Petitioner arranged to have Blanding sell the heroin in Ohio.  (*See id.* at 7-8; Transcript of Trial, conducted Oct. 6-28, 1998 ("Trial Tr.") (Dkts. 17-18, 20-22), at 762-66.)

Caban further testified that, about six weeks after Blanding was given the heroin to sell in Ohio, Blanding returned to New York City by bus, arriving shortly after midnight on the morning of June 10, 1993.  (Direct Appeal Mem., at 8-9; *see also id.* at 18-19.)  Caban testified that he, Petitioner, and others (including Martinez, Simpson, Rafael Ortiz ("Ortiz"), and Lyland Roland ("Roland")) were all waiting for Blanding at the bus station when Blanding arrived. (Direct Appeal Mem., at 8-9.)  Petitioner, Caban, and Ortiz surrounded Blanding, took Blanding's gun and approximately $2500 from him, and pushed him into their black van.  (*Id.* at 9.)  When asked where the rest of the money was, Blanding claimed that he had spent it, but promised that he would "work it off."  (Trial Tr., at 835-36 (trial testimony of Caban); Direct Appeal Mem., at 9.)

According to Caban's testimony, Petitioner, Caban, and the others then decided to kill Blanding.  (*See id.* at 9-10.)  Caban testified that they drove Blanding to the Whitestone Bridge, which connects Queens and the Bronx, and parked underneath the bridge.  (*Id.* at 10.)  According to Caban, Petitioner then took a gun from Ortiz and walked out of Caban's view with Martinez and Blanding.  (*See id.* at 10-11.)  Caban testified that he heard five gunshots (*see id.* at 10-11; *see also id.* at 19 (autopsy indicated that Blanding had been shot five times at close range)), and, further, that both Petitioner and Martinez told him that Martinez had killed Blanding (*id.* at 10, 11).

Caban also testified, over Petitioner's objection, about Petitioner's significant involvement in the narcotics trade.  (*See id.* at 50.)  In particular, Caban testified that he "knew

[Petitioner] used to cut [drugs]" (*id.* (citing Trial Tr., at 730)), and that Petitioner had a group of cohorts who sold drugs for him (*id.* (citing Trial. Tr., at 748, 750, 761-63)).

### b.   Testimony Corroborating Caban's Account

In addition to Caban's testimony, the prosecution introduced testimony from James Venson ("Venson"), Fred Brown ("Brown"), and Nick Quinones ("Quinones"), further supporting the prosecution's claim that Petitioner was involved in Blanding's killing, and countering Petitioner's anticipated defense (*see* Background Section A(2), *infra*) that he was not in New York City at the time of the murder.

Venson testified that, about a month prior to Blanding's death, Venson had multiple conversations with Petitioner, Simpson, and Martinez, in which they had discussed "sending the dope to Ohio to make more money." (Trial Tr., at 599-601, 681; *see also* Direct Appeal Mem., at 15-16.) Venson also testified that he had seen Petitioner and Martinez in the Bronx, in a black van, on one or two occasions in the week before Blanding's death. (*Id.* at 16.)

Brown testified that he saw Petitioner on June 9, 1993, in the Bronx, and that Petitioner claimed to have heard that Blanding had stolen $2,000 of Petitioner's money. (Trial Tr., at 453-56.[2]) Brown also testified that he saw Petitioner in the Bronx the next morning (*i.e.,* the day of the shooting), at about 11:00 a.m. (Direct Appeal Mem., at 15.)

Quinones testified that he met Petitioner in 1996 at the Bronx House of Detention, where Quinones was being held on narcotics and homicide charges. (*See id.* at 18.) According to Quinones's testimony, Petitioner told Quinones that Petitioner and his associates had killed

---

[2] Although citing to Brown's trial testimony, which indicates that Petitioner claimed Blanding had stolen $2,000 from him (*see* Trial Tr. at 453-56), Petitioner's appellate brief indicates the amount allegedly stolen was $1,000 (*see* Direct Appeal. Mem., at 14).

Blanding because Blanding owed them money.  (*Id.*)  Quinones further testified that Petitioner

had proposed a plan in which Quinones and Petitioner would provide alibis for each other.  (*Id.*)

### 2.   Petitioner's Case

At trial, Petitioner presented evidence that, at the time of Blanding's shooting, he was in

Schenectady, which is a three hour drive from New York City.  (*See* Trial Tr., at 1437.)  Helen

DiMatteo ("DiMatteo"), a private duty nursing assistant and day care provider, testified that

Petitioner lived at her home in Schenectady from the spring of 1993 until the spring of 1994 and

that, on June 9, 1993, she celebrated Petitioner's birthday, with him, in her home, with dinner

and cake.  (Direct Appeal Mem., at 21.)  Likewise, Petitioner testified that he moved to

Schenectady in March 1993, and was living there in June 1993.  (*Id.* at 22.)  He testified that he

was not in New York City on June 9 or 10, 1993.  (*Id.*)

Petitioner also testified that he knew Caban only "by face," and that he was not friends

with Caban.  (*Id.* at 22.)  According to Petitioner's testimony, Petitioner never agreed to sell

heroin with Caban.  (*Id.* at 23.)  Although Petitioner acknowledged meeting Quinones at the

Bronx House of Detention, he denied ever asking Quinones to be an alibi witness for him.  (*Id.* at

24.)

On cross examination, the prosecution asked Petitioner about his alleged past

involvement in narcotics trafficking (*id.* at 50), including whether Petitioner had sent two other

individuals – in addition to Blanding – to sell drugs in Ohio (*see id.*).  The prosecution also

asked, over Petitioner's objection, whether Petitioner had abused his former girlfriend during her

pregnancy.  (*See id.* at 53.)

### 3.     The Prosecution's Rebuttal Case

Supplementing the testimony it initially presented regarding Petitioner's whereabouts at or around the time of the murder, the prosecution, in its rebuttal case, introduced testimony from Rochelle Fralin ("Fralin"), Petitioner's former girlfriend and the mother of his child.  (*See id.* at 24.)  Fralin testified that she had seen Petitioner in the Bronx every day, during the two-week period prior to Blanding's death.  (*Id.*)  She specifically testified that she saw Petitioner in the Bronx at about 8:00 p.m. on June 9, 1993, only a few hours before Blanding arrived in New York from Ohio.  (*See id.* at 24; Trial Tr., at 1590-92.)

### 4.     Petitioner's Summation

During summation, Petitioner's counsel attacked the credibility of the prosecution's witnesses, as well as the conduct of prosecutors themselves.  (*See generally* Trial Tr., at 1720-39.)  Petitioner's counsel characterized the prosecution's case as a "shameless desperate search for corroboration where they made deals" (*id.* at 1720), and argued that the prosecution had "shamefully exploit[ed]" its witnesses in a "disgusting" manner (*id.* at 1721).  Petitioner's counsel further argued that the prosecutor's office was "reckless in [its] investigation," that the prosecution's decision to present the testimony of incredible witnesses was "shameful" and "disgusting," and that the prosecution's case was "totally lacking integrity."  (*Id.* at 1721-22.)

When, during summation, Petitioner's counsel specifically attacked the prosecution's decision to elicit testimony from Venson, the Court sustained the prosecution's objection to such remarks:

> Mr. DuBoulay
> [Petitioner's counsel]:          Can you trust this prosecution who puts a guy on the stand
>                                  with a whole story where the guy is not even there[?]  What
>                                  kind of investigation did they do?  Did they even look at
>                                  his rap sheet?  I looked at his rap sheet.  If you don't even

|  | look at a guy['s] rap sheet – come on.  How are you going to put a guy on the stand on a matter so important like this [it's] reckless – |
|---|---|
| Ms. Florio [for the prosecution]: | Objection. |
| Mr. DuBoulay: | I'm talking about the office, Judge. |
| The Court: | No.  No you can't.  Don't.  Make it about the witnesses.  That's fine[,] but [do] not impugn[] the integrity of another attorney or prosecutor[,] that's not right. |
| Mr. DuBoulay: | Judge, I'm talking about the office. |
| The Court: | No.  No.  Don't talk – No.  Talk about the witnesses. |
| Mr. DuBoulay: | Let's talk about the integrity of the case. |
| The Court: | Let's talk about the witnesses in the case. |

(Trial Tr., at 1731-32.)

When, on summation, Petitioner's counsel later questioned the reliability of Brown's

testimony during summation, the Court again sustained the prosecution's objection to purported

"attacks" against prosecutor's office:

| [Mr. DuBoulay]: | [Fred Brown] gives you the ludicrous story that [Petititioner] came up to him and starts crying [t]o him . . . about [Blanding] ripped off somebody.  Ridiculous.  Years later he comes up and says that.  This searching, the desperate attempt.  That's the kind of evidence you're presented with. |
|---|---|
| Ms. Florio: | Objection. |
| Mr. DuBoulay: | That's the kind of evidence – |
| The Court: | Just focus on the evidence, not make it a personal attack to the D.A.'s office . . . .  Don't refer to the district attorney's office.  Refer to the witness.  Refer to the evidence and just as the assistant district attorney cannot impugn[] your integrity, you can't |

> impugn[] the D.A.'s office['s].  Just stick with the witnesses and to the evidence.  Let's just focus there.

(Trial. Tr., at 1739-41.)

5.   **The Jury Charge**

With respect to Petitioner's alibi defense, the jury charge contained the following

instruction:

> Now, as I go to the specific charges in the case, you'll notice that the first element that I list, [that I] give you [in] each of the charges[,] deals, in essence, with the question of whether as you deliberate as to each defendant, whether that defendant was correctly identified as being involved in the crime, [the] so-called identification element, if you will, and indeed one defendant, [the Petitioner], introduced testimony that he was somewhere else when the crime allegedly took place.
>
> That's what [Petitioner] contends that the evidence should lead you to conclude, that he could not have committed these crimes because at the time of the incident he was in Schenectady, New York, not down here [in the Bronx].  This is known as an alibi defense.
>
> You're obligated to consider and evaluate the testimony and the credibility of the alibi witness, Mrs. Helene DiMatteo, as you would the testimony of any other witness.  If you are satisfied that her evidence as to alibi creates a reasonable doubt as to the guilt of [Petitioner], that is that the prosecution hasn't disproved the alibi defense beyond a reasonable doubt, then [Petitioner is] entitled to be acquitted.
>
> By the same token, of course, you understand that if the People have satisfied you from their witnesses beyond a reasonable doubt that [Petitioner] was one of those present during the killing of Damian Blanding, they will, of necessity, have disproved the alibi.

(Trial Tr., at 1866-67; *see also* Direct Appeal Mem., at 63-64.)  At trial, Petitioner raised no

objection to the jury charge.  (Trial Tr., at 1886.)

8

### 6.      Verdict and Sentence

Petitioner and his two co-defendants, Martinez and Simpson, were each found guilty of two counts of Murder in the Second Degree, in violation of N.Y. Penal Law § 125.25[1] and [3] (intentional and felony murder), one count of Robbery in the First Degree, in violation of N.Y. Penal Law § 160.15[2], one count of Robbery in the Second Degree, in violation of N.Y. Penal Law § 160.10[1], and one count of Kidnapping in the Second Degree, in violation of N.Y. Penal Law § 135.20.  (*See* Direct Appeal Mem., at 25.)  On November 30, 1998, Petitioner was sentenced to 22 years to life on both murder counts, 12 and one-half to 25 years for first-degree robbery, five to 15 years for second-degree robbery, and eight and one-third to 25 years for second-degree kidnapping. (*Id.*; *see also People v. Chebere*, 740 N.Y.S.2d 25, 26 (1st Dep't 2002)).  All of the sentences were to run concurrently.  (*See* Direct Appeal Mem., at 25.)

### B.      Petitioner's Direct Appeal

On August 1, 2001, Petitioner filed a direct appeal, arguing that:  (1) his conviction was against the weight of the evidence (*id.* at 26-41); (2) his conviction was based upon the patently false testimony of Venson, which was the result of prosecutorial misconduct and violated Petitioner's due process rights (*id.* at 42-49); (3) he was improperly prejudiced by the introduction of excessive evidence of his purported involvement in the drug trade (*id.* at 49-53); (4) he was improperly cross-examined about highly prejudicial and non-probative allegations that he had abused his pregnant girlfriend (*id.* at 53-57); (5) the trial court unjustifiably prevented Petitioner's trial counsel from attacking the prosecution's case during summation (*id.* at 58-62); (6) the trial court's alibi instruction was improper because it failed to explain that Petitioner "had no burden to prove that he was not the person who committed the crime" (*id.* at 63-66); and (7) his sentence was excessive (*id.* at 67-69).

9

The Appellate Division unanimously affirmed the judgment convicting Petitioner. *Chebere*, 740 N.Y.S.2d at 26 (citing *People v. Martinez*, 287 A.D. 2d. 353 (1st Dep't 2001)). The court rejected Petitioner's arguments about the weight of the evidence on the ground that those arguments were "similar to arguments previously rejected by this Court on the [appeals of Petitioner's co-defendants Martinez and Simpson]," and the court found "no reason to reach a different result here." *Id.*; *see also People v. Simpson*, 284 A.D. 2d. 238 (1st Dep't 2001). The court thus concluded that "[t]he verdict [against Petitioner] was based on legally sufficient evidence and was not against the weight of the evidence." *Chebere*, 740 N.Y.S.2d at 26.

The court also held that the evidence at trial of Petitioner's purported involvement in the drug trade had not been unnecessarily excessive or unduly prejudicial, and noted that "[u]nder the circumstances of the case, an effort to limit or sanitize this evidence would have unduly restricted its probative value." *Id.* The court similarly concluded that the prosecution's cross-examination of Petitioner's concerning his alleged abuse of his girlfriend did not deprive him of a fair trial, as the cross-examination on this issue "had a good faith basis and was relevant to [Petitioner]'s credibility." *Id.*

The court was also unpersuaded by Petitioner's argument that the trial court had improperly limited defense counsel's summation; the court found that Petitioner's trial counsel had been "making an argument that was not based on the evidence and amounted to personal attacks on the prosecutor," and further found that Petitioner's trial counsel had nevertheless "received ample latitude to argue the point he was seeking to advance." *Id.*

Finally, the court found that Petitioner's two remaining claims – *i.e.*, that his conviction was based upon the false testimony of Venson, which was the result of prosecutorial misconduct, and that the trial court's alibi instruction was improper – were unpreserved. The court declined

10

to review these claims in the interest of justice, but noted that "[w]ere [the court] to review these claims, [the court] would reject them." *Id.*[3]

The parties do not appear to have supplied this Court with Petitioner's application for leave to appeal to the Court of Appeals. Nevertheless, Respondent concedes that Petitioner sought review of the Appellate Division's decision with respect to every claim that Petitioner had raised before that court. (*See* Sandusky Aff. ¶ 18.) The Court of Appeals summarily denied leave to appeal on June 14, 2002. *See People v. Chebere*, 98 N.Y.2d 673 (2002).

**C.      Petitioner's Section 440 Motion To Vacate**

In addition to filing a direct appeal, Petitioner, proceeding *pro se,* also sought to set aside his conviction through a series of collateral motions and petitions. In fact, even before he filed his direct appeal, Petitioner, on April 3, 1999, filed a motion to vacate his conviction pursuant to N.Y.C.P.L. § 440.10(1). (*See* Sandusky Aff., Ex. 1 (Affidavit in Support of Motion to Vacate Judgment CPL 444.10, dated Apr. 3, 1999 ("Pet. 440 Mtn.")).) Petitioner's Notice of Motion included a bare recitation of six statutory grounds for vacating the judgment against him, quoting nearly verbatim N.Y.C.P.L. § 440.10 (a), (b), (c), (f) and (h). (*See id*.) It appears, however, from Petitioner's submissions, both in the state court and here, that he intended to raise only three claims in this motion,[4] specifically, that the judgment against him should be vacated because: (1) the prosecution allegedly withheld exculpatory evidence regarding its alleged agreements with cooperating witnesses, in violation of, *inter alia*, *Brady v. Maryland*, 373 U.S.

_____

[3] The court summarily rejected Petitioner's request for a reduction of his sentence. *Id.*

[4] *See* Pet. 440 Mtn. (setting forth three point headings with supporting arguments on each of those three points); *see also* Motion To Amend F.R.C.P. Rule 15(d), dated Nov. 5, 2007 ("Pet. Amend. Mtn.") (Dkt. 12) (indicating Petitioner's desire to pursue a total of 13 claims on habeas, including three claims from his initial Section 440 motion).

83 (1963) (*see* Pet. 440 Mtn., ¶¶ 6-8); (2) the prosecution knowingly elicited false testimony

from cooperating witnesses about the absence of any agreement to cooperate in the prosecution

of Petitioner (*see id.* ¶¶ 11-13, 28); and (3) Petitioner received ineffective assistance of trial

counsel because his counsel did not, prior to trial, adequately investigate the crime scene or

interview certain witnesses, including Oscar Diaz ("Diaz"), who purportedly had exculpatory

information,[5] and Quinones (*see id.* ¶¶ 20-27).

      The trial court denied Petitioner's Section 440 motion in its entirety.  (*See* Sandusky Aff.,

Ex. 4 (Order, dated Dec. 19, 1999 ("12/19/99 Order")), at 4.)  With respect to Petitioner's claims

of prosecutorial misconduct – *i.e.*, the alleged withholding of *Brady* material and eliciting of

false testimony – the court found that Petitioner's submissions were "facially insufficient," as

Petitioner had failed to submit any evidence in support of the accusations he made.  (*Id.* at 1-2.)

The court also found that Petitioner had failed to provide any evidentiary support for his

ineffective assistance of counsel claims, and, further, found that trial counsel appeared to have

been adequately prepared throughout the pre-trial and trial proceedings:

> [Petitioner] makes several other complaints against
> counsel:  that he did not meet with [Petitioner] until two days
> before the trial; that he failed to visit the scene of the crime; and

---

[5] According to Petitioner, Diaz had information that directly contradicted the testimony of Caban, the prosecution's key witness.  (*See* Sandusky Aff., Ex. 5 (Affidavit in Support of Application for Leave to Appeal C.P.L. 8460.15, dated May 18, 2001 ("440 Appeal Aff.") (unpaginated)), at 11.)  In particular, Caban purportedly told Diaz, prior to Petitioner's trial, that "the two people involved in the crime with [Caban] [were] not [Petitioner], but [were] two brothers from around the same neighborhood.  However, [Caban] was afraid to reveal the identity of these two brothers because they were free in society and he feared that if he gave them up to the police, they would cause himself or his family harm."  (*Id.*)  Petitioner claimed that, in light of this information, he had repeatedly urged his trial counsel to interview Diaz prior to trial, but counsel had failed to do so.  (*Id.*)  Petitioner also claimed that the District Attorney had attempted to interview Diaz prior to trial, but that Diaz had refused to speak with prosecutors, hoping to speak with defense counsel instead.  (*Id.* at 11-12)

that he failed to investigate [Petitioner's] alibi defense.  The trial transcript, however, does not support these allegations.  Before the trial, the case was transferred to me for pre-trial hearings.  With the defendant present in court, counsel participated in several lengthy pre-trial conferences and ultimately the hearing itself.  Counsel was fully prepared for the conferences and the hearing and had a comprehensive understanding of the case.  It was obvious that he had already met and extensively conferred with his client to prepare a defense.

When the trial commenced almost two weeks later, counsel had a coherent strategy, made cogent legal arguments and competently cross examined each of the prosecution witnesses.  The trial lasted over three weeks and, contrary to the [Petitioner]'s allegations, counsel not only considered an alibi defense but called an alibi witness, Helene DiMatteo.  The [Petitioner]'s motion contains no affidavits from any other alibi witnesses and fails to name any others as potential alibi witnesses.  He thus has failed to demonstrate that any other witnesses exist (*see People v. Aiken*, 45 N.Y.2d 394).  Even had he provided any such names, he has also failed to show that counsel did not have a strategic or other legitimate explanation in not calling them to testify.  (*See People v. Ford*, 46 N.Y.2d 102; *People v. Newton*, 192 A.D.2d 44).

Finally, as for [Petitioner]'s claim that counsel failed to visit the crime scene, even if true, [Petitioner] has not established that it would be even marginally relevant for his attorney to have visited a four year old crime scene beneath the Whitestone [B]ridge in order to adequately prepare his defense.

(*Id.* at 3-4.)  The Court also noted that, to the extent Petitioner faulted his trial counsel for failing to interview Diaz before trial, the record indicated that counsel did interview Diaz after trial and, further, that Petitioner had declined to make any post-verdict motion based upon the information obtained in that post-trial interview.  (*Id.* at 3.)

Petitioner requested leave to appeal the trial court's denial of his motion to vacate, challenging the denial of his three claims, and arguing that the trial court should have either (1) held an evidentiary hearing, or (2) held Petitioner's motion in abeyance while Petitioner pursued Freedom of Information Law ("FOIL") requests for evidence to support his motion.

13

(*See* 440 Appeal Aff., at 4, 10-11.)  Petitioner's failure to provide evidence to support his motion

to vacate, he argued, was the result of the state's failure to provide such evidence to him in

response to his pending FOIL requests.  (*See id.* at 11.)  The Appellate Division denied this

request for leave to appeal.  *See People v. Chebere*, No. M-3217, 2001 N.Y. App. Div. LEXIS

7285 (1st Dep't June 28, 2001).

### D. Petitioner's First FOIL Request and Article 78 Petition

In July 1999, while Petitioner's motion to vacate was pending, Petitioner requested,

pursuant to FOIL, that the District Attorney of Bronx County ("DA's Office") disclose

documents relating to Quinones.  (*See* Sandusky Aff., Ex. 3.)  Although the DA's Office

disclosed 481 documents (which were "already part of the public record"), it withheld others

(Sandusky Aff., Ex. 6), and Petitioner then filed an Article 78 petition challenging the position of

the DA's Office that certain documents were appropriately withheld (*see* Sandusky Aff., Ex. 9).

The Bronx County Supreme Court dismissed the Article 78 petition and did not require any

further disclosure by the DA's Office at that time.  (*See* Sandusky Aff., ¶ 19.)

### E. Petitioner's First Motion To Renew His Section 440 Motion

On December 8, 2003, following the trial court's denial of Petitioner's Article 78 petition

(which was later reversed by the Appellate Division, *see infra*), Petitioner moved to renew his

prior Section 440 motion to vacate, on the ground that his FOIL litigation had, according to

Petitioner, revealed evidence that the prosecutor had in fact withheld exculpatory evidence.  (*See*

Sandusky Aff., Ex. 11 (Memorandum of Law, dated Dec. 3, 2003), at 3-4.)  In particular,

Petitioner argued that the DA's Office's admission that it had notes of interviews with Quinones, coupled with its refusal to disclose those notes, evinced a *Rosario* violation.[6]  (*See id.* at 4.)

The trial court denied Petitioner's motion to renew on the ground that he had not come forward with any "newly discovered evidence" that would alter the court's determination of the underlying motion to vacate, *see* N.Y. C.P.L.R. § 2221(e)(2).  (*See* Sandusky Aff., Ex. 13, at 2-3 (concluding that the motion to renew was "predicated upon newly discovered evidence that [Petitioner] has yet to discover").)  The court noted, however, that, if Petitioner's "pending Article 78 proceeding [should] yield the information sought, [Petitioner] may have a basis to renew [his] motion to vacate."  (*Id.* at 3.)

## F.   **Subsequent Rulings on Petitioner's First FOIL Request**

As noted above (*see* Background Section D, *supra*), the Bronx Supreme Court initially dismissed the Article 78 petition in which Petitioner had challenged the decision of the DA's Office to withhold various documents in response to his FOIL request.  In 2004, however, the Appellate Division reversed this trial court ruling and remanded the matter for an *in camera* inspection of the withheld documents.  *See Chebere v. Johnson*, 770 N.Y.S.2d 357, 358 (1st Dep't 2004).  Following remand, the trial court (Ruiz, J.S.C.) inspected the withheld documents and concluded that only certain of those documents were exempt from disclosure under FOIL as work product and/or for "witness safety" reasons – specifically, "the NYSIS sheet of the witness

---

[6] In *People v. Rosario*, 9 N.Y.2d 286 (N.Y. 1961), the New York Court of Appeals held that a criminal defendant is entitled to examine any prior statement of a witness called by the prosecution, where the prior statement relates to the subject matter of the witness's testimony, *id.* at 289-91.  That rule was later codified as New York Criminal Procedure Law § 240.45(1)(a).  If the prosecution fails to disclose so-called *Rosario* material, the defendant may be entitled to a reversal of the conviction or some other sanction, depending on the circumstances of the failure to disclose and the content of the material.  *See People v. Martinez*, 71 N.Y.2d 937, 940 (N.Y. 1988); *see also* N.Y. Crim. Proc. § 240.70.

[Quinones], notes apparently taken by ADA Florio in preparation for trial, references to Social Security Numbers, residences, names of the witnesses' family or friends and their personal information, names of Probation Officers, documents relating to travel arrangements made for Quinones during trials[,] and material from Florida."  (Sandusky Aff., Ex. 14 (Order, dated Nov. 22, 2004 ("11/22/04 Order")), at 6 (emphasis omitted).)[7]  The DA's Office then produced a number of documents to Petitioner, in redacted form.[8]

### G.    Petitioner's Second Motion to Renew His Section 440 Motion

On May 5, 2006, Petitioner moved, for a second time, to renew his motion to vacate his conviction.  (*See* Sandusky Aff., Ex. 15 (Notice of Motion, dated May 5, 2006).)  In this motion, Petitioner reiterated his claims regarding the prosecution's alleged withholding of *Brady* material related to Quinones's testimony, and explained how Quinones's own trial testimony supported Petitioner's belief that Quinones had been offered "gifts" or other compensation for his testimony against Petitioner.  (*See* Sandusky Aff., Ex. 15 (Affidavit in Support of Notice of Motion, dated May 5, 2006), ¶¶ 9-14.)  Petitioner also raised a seemingly new argument, based on the double jeopardy clause of the Fifth Amendment:  according to Petitioner, the alleged misconduct of the prosecutors during and after trial barred the state from retrying Petitioner for Blanding's death in the event that Petitioner's motion to vacate was granted.  (*See id.* ¶¶ 20-29

---

[7] In its ruling, the trial court made clear that, although Petitioner's FOIL request had "intermingled . . . *Brady* demands . . . in an apparent attempt to prepare a motion pursuant to CPL 440, . . . those issues do not bear on the instant motion."  (*Id.* at 4.)  Rather, the court explained, the "only matter of concern" to the court was Petitioner's FOIL request.  (*Id.* at 4-5.)  Nevertheless, the court noted that Petitioner's alleged *Brady* violations "strain[ed] credulity."  (*Id.* at 5-6.)

[8] Respondent provided a copy of this production to this Court, *in camera*, via letter dated October 14, 2010.

(alleging misconduct); *see* Sandusky Aff., Ex. 15 (Memorandum of Law, dated May 5, 2006) at 22-25.)

The trial court denied Petitioner's motion in its entirety.  (*See* Sandusky Aff., Ex. 18.) The court found that Petitioner had failed to identify any new facts in support of his claims, as required to support a motion to renew.  (*See id.*, at 6; *see also* N.Y.C.P.L.R. § 2221(e)(2).)  The court explained that, while the prosecution had produced additional documents in connection with Petitioner's FOIL request, Petitioner had failed "to establish that the People withheld any item that fell within the class of discoverable documents that the People were required to turn over at trial." (Sandusky Aff., Ex. 18, at 5.)   The court further held that Petitioner's contention that the prosecution had only disclosed notes from one of two interviews of Quinones by the DA's Office was contradicted by the record, as "the trial transcript conclusively establishes that [Petitioner's] trial counsel cross-examined . . . Quinones concerning" the interview that Petitioner alleged had not been disclosed.  (*Id.*)  On January 25, 2007, Petitioner sought leave to appeal this decision to the Appellate Division, but leave was denied on July 19, 2007. (Sandusky Aff., ¶¶ 35-36.)

## H.    Petitioner's Second FOIL Request

By letter dated December 12, 2007, Petitioner submitted a FOIL request to the New York City Department of Investigation ("DOI") requesting documents about Quinones.  (*See* Notice of Motion for Leave to Conduct Discovery Pursuant to Title 28 U.S.C. 2254 Rule 6(a), dated Jan. 15, 2010  ("Pet. Discovery Mtn.") (Dkt 25), Ex. A.)  The DOI denied Petitioner's request, explaining that the DOI "ha[d] no substantiated allegations concerning Nick Quinones."  (Pet. Discovery Mtn., Ex. B.)  The DOI further determined that any other material concerning Quinones in the DOI's possession would be exempt from disclosure under FOIL, pursuant to

17

New York Public Officers Law § 87(2)(b), because such disclosure would constitute an unwarranted invasion of personal privacy.  (*Id.*)  Petitioner appealed this determination, arguing that DOI could not properly withhold documents based on Public Officers Law § 87(2)(b) without demonstrating legitimate safety concerns.  (Pet. Discovery Mtn., Ex. C (citing *Chebere*, 770 N.Y.S.2d 357).)  The DOI denied Petitioner's appeal, stating:  "To the extent DOI has additional responsive documents in its possession that have not already been provided to you," the disclosure of such documents "would reveal, *inter alia*, unsubstantiated allegations of misconduct and identities of witnesses and confidential information those witnesses provided." (Pet. Discovery Mtn., Ex. D (citations omitted).)

## I.     **The Habeas Petition and Amended Petition**

Petitioner commenced this habeas action on September 6, 2003, by filing a Petition in which he sought to raise all of the claims that he had raised on direct appeal, as well as all of the claims he had raised in his Section 440 motion to vacate.  (*See* Petition Under 28 USC § 2254 for Writ of Habeas Corpus by a Person in State Custody, dated Sept. 6, 2003 (Dkt. 2).)[9]  The Court then granted Petitioner leave to exhaust certain additional claims in state court, which were, at the time, the subject of the further state court proceedings described above.  (*See* Dkts. 6, 8.)  On November 5, 2007, apparently upon completion of his efforts to exhaust, Petitioner filed a Motion to Amend to add these additional claims, and two others.  (*See* Pet. Amend. Mtn., at 8-39 (summarizing proposed amendments).)  In his motion papers, Petitioner made clear that he intended to raise before this Court all the claims he had raised on direct appeal (*see* Background Section B, *supra*), all the claims he had raised in his Section 440 motion to vacate and related

_____

[9] As mentioned above, although the Court's docket reflects a filing date of January 15, 2004, the Court deems the Petition to have been filed on September 6, 2003.  (*See* n.1, *supra*.)

motions to renew (*see* Background Sections C, E, G, *supra*), as well as two new claims:  (1) that

Petitioner was denied a "full and fair" hearing regarding the prosecution's alleged withholding of

*Brady* material, both before and after trial, in violation of Petitioner's due process rights (*see* Pet.

Amend. Mtn., at 19-32); and (2) that Petitioner was denied the effective assistance of counsel

when his trial counsel failed "to fully explore the circumstances [under which] Quinones

testified"[10] (*id.* at 33-39).  This Court granted Petitioner's motion to amend on December 27,

2007.  (*See* Dkt. 10)

Petitioner filed his Amended Petition on February 13, 2008 (*see* Am. Pet.), and

Respondent filed an opposition on September 9, 2008 (*see* Sandusky Aff.; *see also*

Memorandum of Law, filed Sept. 9, 2008 ("Resp. Mem.") (annexed to Sandusky Aff.)).

Although Petitioner did not file a reply to Respondent's opposition papers, he did file a motion

for leave to conduct discovery of documents that, according to Petitioner, had been withheld

from him in contravention of *Brady*.  (*See* Pet. Discovery Mtn.)  The Court granted Petitioner's

motion in part, but only to the extent that the Court ordered Respondent to produce certain

documents to the Court for *in camera* review to determine whether those documents constituted

*Brady* material.  (*See* Order, dated Sept. 17, 2010 (Dkt. 27), at 6-7.)  Respondent submitted these

documents to the Court on October 14, 2010.

---

[10] Petitioner argued, among other things, that his trial counsel did not vigorously attempt
to obtain purported *Brady* material from the prosecution and did not adequately probe the fact
that, only minutes after Petitioner was put in a cell next to Quinones's cell, Quinones was
"suspiciously" moved to a cell next to Caban's.  (*See id.*)

**DISCUSSION**

I.     **APPLICABLE LEGAL STANDARDS**

    A.     **Statute of Limitations**

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a habeas petition must be filed within a one-year limitations period beginning on the latest of four dates, usually "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A) (2000); *see also Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001) (citations omitted) (judgment becomes "final" for purposes of Section 2244 upon "the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner elects not to file a petition for certiorari – [the expiration of] the time to seek direct review via certiorari").[11]

Here, Petitioner's habeas petition was timely filed, as it was filed within one year of the date upon which Petitioner's conviction became final.  *See* 28 U.S.C. § 2244(d)(1)(A).  On June 14, 2002, the Court of Appeals denied Petitioner's request for leave to appeal the Appellate Division's affirmance of his conviction, *see People v. Chebere*, 98 N.Y.2d 673 (2002), and, 90 days later, on September 12, 2002, Petitioner's conviction became final for the purposes of

---

    [11] The limitations period may alternatively begin to run on the following dates:  (1) where the petitioner was prevented from filing an application by state action, the date on which the impediment is removed; (2) where the right asserted is a newly recognized one made retroactively applicable, the date on which the constitutional right asserted was initially recognized by the Supreme Court; and (3) the date on which the factual predicate of the claim presented could have been discovered through the exercise of due diligence.  *See* 28 U.S.C. § 2244(d)(1)(B)-(D).

the relevant limitations period, *see Williams*, 237 F.3d at 151.  The Petition was timely filed on September 6, 2003, less than one year from that date; Respondent does not contend otherwise.

**B.**    **Exhaustion**

A federal court may not consider a petition for a writ of habeas corpus unless the petitioner has exhausted all state judicial remedies.  28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275 (1971); *Doresy v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997).  To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the "'opportunity to pass upon and correct alleged violations of . . . prisoners' federal rights."  *Picard*, 404 U.S. at 275 (citing *Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)).  There are several ways by which a petitioner can fairly present a federal claim to the state appellate court, including by citing the relevant provisions of the federal Constitution in his appellate brief.  *See Davis v. Strack*, 270 F.3d 111, 122-23 (2d Cir. 2001).  Once the state courts are appraised of the constitutional nature of a petitioner's claims, the exhaustion requirement is fulfilled when those claims have been presented to "the highest court of the pertinent state."  *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (citation omitted).

In this case, despite this Court's granting of a lengthy stay of these proceedings to enable Petitioner to exhaust his claims, Petitioner has nonetheless still presented a "mixed" petition, *i.e.*, one that presents both exhausted and unexhausted claims.  *See Rhines v. Weber*, 544 U.S. 269, 271 (2005).  In particular, Petitioner's final two claims, raised for the first time in his Amended Petition, have not been exhausted in the state courts.  When ruling on a mixed petition, the Court may dismiss the entire petition outright.  *See id.* at 277-78.  Alternatively, as was previously done here, the Court may, in its discretion, stay the proceedings and hold the petition in

21

abeyance, so as to permit the petitioner to return to the state courts to exhaust any unexhausted claims, assuming an avenue for exhaustion is still available.  *See id.*  If, however, the petitioner does not show good cause for his failure to exhaust any unexhausted claims, or if those claims are plainly meritless, then the issuance of a stay (or, as in this case, a further stay), would be an abuse of the Court's discretion.  *See id.* at 277.  Where a court "determines that stay and abeyance is inappropriate, the court should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief."  *Id.* at 278.  Under AEDPA, the Court may also dismiss any unexhausted claims on the merits.  *See* 28 U.S.C. § 2254(b)(2); *see also, e.g.*, *Aparicio v. Artuz*, 269 F.3d 78, 91 n.5 (2d Cir. 2001).

In this case, I recommend that the Court proceed to consider Petitioner's claims, and that it dismiss the unexhausted claims on their merits, under 28 U.S.C. § 2254(b)(2).

### C.   <u>Standard of Review</u>

Where a federal constitutional claim has been adjudicated on the merits by the state court, this Court must accord substantial deference to the state court's decision under the standard of review dictated by AEDPA.  *See* 28 U.S.C. § 2254(d); *see also Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground").  The relevant section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application

of, clearly established [f]ederal law, as determined by the Supreme
Court of the United States; or (2) resulted in a decision that was based
on an unreasonable determination of the facts in light of the evidence
presented in the State court proceeding.

28 U.S.C. § 2254(d).  In addition, under AEDPA, where not manifestly unreasonable, a state

court's factual findings are presumed correct, and can only be overcome by "clear and

convincing evidence."  28 U.S.C. § 2254(e)(1).

Under AEDPA, a state court decision is "contrary to" clearly established federal law

where the state court either applies a rule that "contradicts the governing law" set forth in

Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a

[Supreme Court] decision" and arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362,

405-06 (2000).  An "unreasonable application" of clearly established federal law occurs when

the state court identifies the correct governing legal principle, but unreasonably applies that

principle to "a set of facts different from those of the case in which the principle was

announced."  *Lockyer v. Andrade*, 538 U.S. 63, 73-76 (2003).  The state court's decision,

however, "must have been more than incorrect or erroneous"; rather, "[t]he state court's

application must have been 'objectively unreasonable.'"  *Wiggins v. Smith*, 539 U.S. 510, 520-21

(2003) (quoting *Williams v. Taylor*, 529 U.S. at 409).  Under this "difficult to meet" standard,

"even a strong case for relief does not mean the state court's contrary conclusion was

unreasonable."  *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (citing *Lockyer v. Andrade*,

538 U.S. 63, 75 (2003)).  In order to be entitled to habeas relief, the petitioner must show that

"the state court's ruling on the claim being presented in federal court was so lacking in

justification that there was an error well understood and comprehended in existing law beyond

any possibility for fairminded disagreement."  *Id.* at 786-87.  In other words, "[a] state court's

determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision" in light of clearly established federal law.[12]  *Id.* at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## II.    PETITIONER'S CLAIMS

Petitioner appears to assert 13 grounds for habeas relief.  The first seven mirror those brought on direct appeal:

(1)    Petitioner's conviction was against the weight of the evidence, and/or was based on insufficient evidence;

(2)    Petitioner's conviction was based upon the patently false testimony of James Venson, which was the result of prosecutorial misconduct and violated Petitioner's due process rights;

(3)    Petitioner was improperly prejudiced by the introduction of unnecessarily excessive evidence of his purported involvement in the drug trade;

(4)    Petitioner was improperly cross-examined about highly prejudicial and non-probative allegations that he had abused his pregnant girlfriend;

---

[12] The Supreme Court has emphasized that "clearly established [f]ederal law" refers only to the "'holdings, as opposed to the dicta, [of the Supreme Court's] decisions as of the time of the relevant state-court decision.'"  *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams v. Taylor*, 529 U.S. at 412); *see also Rodriguez v. Miller*, 537 F.3d 102, 106-07 (2d Cir. 2008) ("*Musladin* admonishes courts to read the Supreme Court's holdings narrowly and to disregard as dicta for habeas purposes much of the underlying logic and rationale of the high court's decisions.").  Thus, a principle of constitutional law "grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court" cannot provide the basis for habeas relief.  *Id.* (citing *Musladin*); *see also Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.") (internal quotation marks omitted).

(5)     the trial court unjustifiably limited Petitioner's trial
         counsel's summation;

(6)     the trial court's alibi instruction was improper because it
         failed to explain that Petitioner "had no burden to prove
         that he was not the person who committed the crime"
         (Direct Appeal Mem., at 63-66); and

(7)     Petitioner's sentence was excessive.

Petitioner's next four claims are based on the claims he raised in his Section 440 motion to

vacate his conviction and in his subsequent motions to renew that motion:

(8)     the prosecution withheld *Brady* material regarding its
         alleged agreements with cooperating witnesses;

(9)     the prosecution elicited false testimony from cooperating
         witnesses;

(10)    Petitioner received ineffective assistance of trial counsel
         because his counsel did not, prior to trial, adequately
         investigate the crime scene or interview certain witnesses;
         and

(11)    the double jeopardy clause prevents Petitioner from being
         retried.

Finally, Petitioner asserts two new claims in his motion to amend his habeas Petition – claims

that:

(12)    Petitioner was denied a "full and fair" hearing regarding
         the prosecution's alleged withholding of *Brady* material, in
         violation of his due process rights; and

(13)    Petitioner received ineffective assistance of counsel when
         his trial counsel failed to explore fully the circumstances
         surrounding Quinones's testimony.

        Each of these claims should be dismissed, either as procedurally barred, non-cognizable,

or without merit.

25

### A.    Claims Raised by Petitioner on His Direct Appeal

#### 1.    Claim 1:  Weight and Sufficiency of the Evidence

On direct appeal, Petitioner first argued that his conviction was "against the weight of the evidence," without directly challenging the sufficiency of the evidence.  (*See* Direct Appeal Mem., at 26-41.)  The Appellate Division nevertheless interpreted Petitioner's argument on this point to raise challenges to both the weight and the sufficiency of the evidence, and denied both of those claims on the merits.  *See Chebere*, 740 N.Y.S.2d at 26 ("The verdict [against Petitioner] was based on legally sufficient evidence and was not against the weight of the evidence.")  Accordingly, this Court will similarly interpret the Amended Petition to assert claims challenging both the weight and sufficiency of the evidence.  *See generally McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (holding that court should read *pro se* submissions "liberally and interpret them to raise the strongest arguments they suggest") (internal quotation marks omitted).

A "weight of the evidence" claim, however, is not cognizable on federal habeas review, as it is grounded entirely in state law.  It originates from New York Criminal Procedure Law § 470.15(5), which permits an appellate court to reverse or modify a conviction where the court determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence."  *See also People v. Bleakley*, 69 N.Y.2d 490, 495 (N.Y. 1987).  Federal habeas review is not available where there is simply an error of state law.  *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or laws or treaties of the United States"); *see also Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution,

26

laws, or treaties of the United States.") (citations omitted).  Thus, to the extent Petitioner is now attempting to raise his "weight of the evidence" claim in this habeas proceeding, the claim must be dismissed.  *See, e.g.*, *Douglas v. Portuondo*, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002) ("A federal habeas court cannot address 'weight of the evidence' claims because . . .  the 'weight of the evidence' argument is a pure state law claim . . . for which habeas review is not available.") (internal quotation marks and citations omitted); *Kearse v. Artuz*, No. 99 Civ. 2428 (TPG), 2000 U.S. Dist. LEXIS 12649, at *2 (S.D.N.Y. Sept. 5, 2000) (summarily dismissing challenge to verdict as against the weight of the evidence on the ground that "[d]isagreement with a jury verdict about the weight of the evidence is not grounds for federal habeas corpus relief").

Petitioner's claim challenging the legal sufficiency of the evidence should also be dismissed, under the standard of review set forth in AEDPA.  The Due Process Clause of the 14th Amendment prohibits conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  On a federal constitutional claim challenging whether the evidence adduced at trial was sufficient to support the verdict, a petitioner "bears a heavy burden . . . because the government receives the benefit of having all permissible inferences drawn in its favor."  *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002) (internal quotation and citations omitted).  Habeas relief is warranted only if the Court finds that, when viewing the evidence most favorably to the prosecution, no rational jury could find guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Farrington v. Senkowski*, 214 F.3d 237, 240-41 (2d Cir. 2000) (citing *Jackson*, 443 U.S. at 324).  Such an inquiry "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'"  *Jackson*, 443 U.S. at 318-19 (quoting *Woodby v. Immigration &*

*Naturalization Serv.*, 385 U.S. 276, 282 (1966)).  Rather, under established Supreme Court law, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   *Jackson*, 443 U.S. at 319 (emphasis in original).

Here, Caban testified in detail about his own involvement, together with Petitioner, in the killing of Blanding.  (*See* Background Section A(1)(a), *supra.*)  Based on his briefing to the Appellate Division, Petitioner makes no argument that Caban's testimony, if true, is legally insufficient to prove the elements of the crimes for which Petitioner was convicted.  (*See* Direct Appeal Mem., at 26-41.)  Rather, Petitioner merely maintains that Caban's testimony – as that of a cooperating witness – was not credible and was insufficiently corroborated by other evidence. (*See id.*)  The jury, however, was entitled to credit the testimony of any witness presented at trial. *See Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir. 1981) (rejecting insufficient evidence claim raised by habeas petitioner because jury was entitled to believe prosecution's witness). Moreover, Caban's testimony *was* corroborated, by the testimony of Venson, Brown, and Quinones.  (*See* Background Section A(1)(b), *supra.*)  In any event, the law is clear that even a lack of corroboration of a cooperating witness's testimony cannot support a constitutional legal insufficiency claim.  *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) ("[T]he government's failure to corroborate a [cooperating] witness's testimony raises a question as to the weight a jury might choose to give that testimony, not its legal sufficiency to support a conviction."); *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989) (stating that "any lack of corroboration goes only to the weight of the evidence, not to its sufficiency").

As a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have credited Caban's testimony and found the essential elements of the

charged crimes beyond a reasonable doubt, *see Jackson*, 443 U.S. at 319, it cannot be said that

the Appellate Division's rejection of Petitioner's legal insufficiency claim was "contrary to," or

an "unreasonable application of" established federal law.  28 U.S.C. § 2254(d).  Accordingly, I

recommend that this claim be dismissed.

### 2.    Claim 2:  "Patently False" Testimony of Venson

On direct appeal, Petitioner also argued that the prosecutor intentionally elicited false

testimony from Venson regarding hearing incriminating conversations between Petitioner and

his accomplices, knowing that testimony to be false, and that such conduct violated Petitioner's

federal due process rights.[13]  (*See* Direct Appeal Mem., at 42-49.)  The Appellate Division did

not specifically address the merits of this claim; rather, after addressing other claims, the court

rejected this one by stating that "[Petitioner]'s remaining contentions are unpreserved and we

decline to review them in the interest of justice."  *Chebere*, 740 N.Y.S.2d at 26.  As discussed

below, this decision of the Appellate Division gives rise to a procedural bar that precludes this

Court from reviewing the claim in a habeas proceeding.[14]

Federal habeas review of a claim is not available where the question has been decided by

a state court, and the state court's decision "rests on a state law ground that is independent of the

---

[13] In the section of Petitioner's appellate brief addressing Venson's testimony, Petitioner appeared to assert separate claims challenging (1) the prosecutor's alleged misconduct, and (2) the alleged violation of Petitioner's due process rights.  (*See* Direct Appeal Mem., at 42-49.) Here, the analysis of these claims collapses, as habeas relief is only warranted on a prosecutorial misconduct claim where the prosecutor's conduct was "so egregious as to violate the [petitioner]'s due process rights."  *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998).

[14] The fact that the Appellate Division also held that, if it were to review this claim, it would reject it, *id.*, does not alter the fact that the claim is procedurally barred from habeas review.  *See Guity v. Ercole*, 07 Civ. 0728 (RPP), 2007 U.S. Dist. LEXIS 82064, at *22 (S.D.N.Y. Nov. 6, 2007).

federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  The state law ground may be substantive or procedural.  *Id.*

In evaluating whether the state court has found a claim to be procedurally defaulted under state law, this Court must look to the last reasoned state court opinion.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).  To determine whether the state law ground on which the state court rested was "truly an *independent* basis for decision or merely a passing reference, such reliance on state law must be clear from the face of the opinion." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (emphasis added) (internal quotation marks and citation omitted); *see also Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) (to preclude federal review, the state court "must 'clearly and expressly state[] that its judgment rest[ed] on a state procedural bar'") (citation omitted).  To be deemed *adequate*, the state procedural rule on which the court's decision was based must be a rule that is "firmly established and regularly followed" by the state in question, *see Ford v. Georgia*, 498 U.S. 411, 423-24 (1991), and must not have been "misapplied in [the petitioner's] case in particular," *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (internal quotation marks and citation omitted).

Here, the last-reasoned state court decision is that of the Appellate Division, and it is clear from the face of that decision that Petitioner's due process claim arising from Venson's testimony was rejected as unpreserved.  *See Chebere*, 740 N.Y.S.2d at 26.  This constitutes an "independent" state-law procedural ground; indeed, this Court has explicitly held that "the Appellate Division's decision that [a] [p]etitioner's remaining contentions were 'unpreserved' is sufficient to establish that it was relying on a procedural bar as an independent ground in disposing of the issue." *Guity v. Ercole*, 2007 U.S. Dist. LEXIS 82064, at *22 (citing *Harris v.*

30

*Reed*, 489 U.S. 255, 265 (1989)).[15]  Further, New York's preservation rule, requiring that parties

raise specific contemporaneous objections to a trial court's rulings before challenging them on

appeal, *see* N.Y.C.P.L. § 470.05(2), affords an "adequate" basis for the Appellate Division's

decision.  *See generally Garcia v. Lewis*, 188 F.3d 71, 79 (2d Cir. 1999); *Alvardo v. Burge*, No.

05 Civ. 1851 (AKH), 2006 U.S. Dist. LEXIS 46708, at *6 (S.D.N.Y. June 30, 2006) ("[F]ailure

to object is not merely technical; the requirement of timely objection allows the trial court to

consider potential errors and correct them in a timely fashion, when it most counts.").  New York

courts have repeatedly held that, in the absence of objections during trial, a criminal defendant's

due process and prosecutorial misconduct claims will be unpreserved for appellate review.  *See*

*People v. Harris*, 98 N.Y.2d 452, 491 (N.Y.1998); *People v. Hooper*, 732 N.Y.S.2d 207, 208

(4th Dep't 2001), *lv. denied* 97 N.Y.2d 755 (N.Y. 2002); *see also* Resp. Mem., at 11-10 (citing

cases).

     Finally, there is no basis for the Court to find that the state's preservation rule was

inappropriately applied in this case.  *See Cotto*, 331 F.3d at 240.  At trial, although one of

Petitioner's co-defendants moved to strike Venson's testimony as incredible as a matter of law,

Petitioner specifically declined to join in that motion.  (*See* Trial Tr., at 1604-05; *see also id.* at

1802-05 (failing to object during prosecution's explanation of Venson's testimony during

summation).)  No party objected to, or moved to strike, Venson's testimony on the ground that it

---

[15] *See also Walker v. Brown*, No. 08-CV-1254 (BMC), 2009 U.S. Dist. LEXIS 59384, at *32 (E.D.N.Y. July 10, 2009) (holding that Appellate Division had decided petitioner's "remaining contentions" on independent and adequate state grounds where the Appellate Division had deemed those contentions "unpreserved for appella[te] review"); *Cephas v. Ercole*, No. 07 Civ. 6048 (NRB), 2008 U.S. Dist. LEXIS 35343, at *21 (S.D.N.Y. Apr. 29, 2008) (holding that claim was precluded from habeas review by the Appellate Division's conclusion that "Defendant's remaining contentions are unpreserved"); *Parreno v. Annetts*, No. 04 Civ. 10153 (GWG), 2006 U.S. Dist. LEXIS 11065, at *26-27 (S.D.N.Y. Mar. 20, 2006) (same).

was perjured, that the prosecution had suborned perjury, or that the prosecutor's conduct in

eliciting the testimony had violated the defendants' due process rights.  (*See id.* at 1604-05.)

There is thus nothing in the record that suggests that the trial court had any opportunity to

consider the due process claim that Petitioner raises here.  On this record, Petitioner's claim

should be held to be procedurally barred from federal habeas review.  *See, e.g.*, *Harripersaud v.*

*Barkley*, No. 04-CV-4035 (NGG) (KAM), 2006 U.S. Dist. LEXIS 17317, at *18, 22-24

(E.D.N.Y. Feb. 27, 2006) (holding that due process claim based upon alleged prosecutorial

misconduct was procedurally barred where the Appellate Division had rejected that claim as

unpreserved).

 Where a claim has been decided by the state court on an independent and adequate state

law ground, the habeas court is precluded from reviewing the defaulted claim unless either

(1) "the petitioner can demonstrate cause and prejudice for the default," *Gray v. Netherland*, 518

U.S. 152, 162 (1996) (citations omitted); *accord Carmona v. United States Bureau of Prisons*,

243 F.3d 629, 633 (2d Cir. 2001) (citations omitted), or (2) the "failure to consider the

[defaulted] claim will result in a fundamental miscarriage of justice," *Coleman*, 501 U.S. at 750

(internal quotation marks and citations omitted).  In this instance, Petitioner cannot overcome the

procedural bar because he cannot demonstrate cause and prejudice, or a fundamental miscarriage

of justice.

 "Cause" for a procedural default is established when "some objective factor external to

the defense" impeded the petitioner's efforts to comply with the state's procedural rule.

*Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Ayuso v. Artuz*, No. 99 Civ. 12015 (AGS)

(JCF), 2001 U.S. Dist. LEXIS 2504, at *23-26 (S.D.N.Y. Mar. 7, 2001); *Williams v. Artus*, 691

F. Supp. 2d 515, 525 (S.D.N.Y. 2010).  Thus, cause for a default exists where a petitioner can

show that (1) "the factual or legal basis for a claim was not reasonably available to counsel,"

(2) "'some interference by state officials' made compliance [with the procedural rule]

impracticable," or (3) "the procedural default is the result of ineffective assistance of counsel."

*Bossett*, 41 F.3d at 829 (citation omitted). "Prejudice" requires a petitioner to demonstrate that

the alleged constitutional error worked to his "*actual* and substantial disadvantage." *United*

*States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original); *accord Femia v. United States*,

47 F.3d 519, 524 (2d Cir. 1995).

Petitioner has not shown cause for his failure to preserve his due process claim arising

from Venson's trial testimony. Although Petitioner might have argued that his trial counsel was

ineffective for failing to object to that testimony, Petitioner made no such argument in state court

and thus cannot advance such a theory here, as "cause" for his procedural default. *See Murray*,

477 U.S. at 488-89 (holding that an ineffective assistance claim cannot be successfully asserted

as cause for a procedural default if that claim has not been separately exhausted and would itself

be barred). As Petitioner cannot show cause for his procedural default, this Court need not reach

the question of whether Petitioner can show prejudice. *See Stepney v. Lopes*, 760 F.2d 40, 45

(2d Cir. 1985) ("Since a petitioner who has procedurally defaulted in state court must show both

cause and prejudice in order to obtain federal habeas review, we need not, in light of our

conclusion that there was no showing of cause, reach the question of whether or not [petitioner]

showed prejudice.").

As noted above, the Court may also excuse a procedural default where the petitioner "can

demonstrate a sufficient probability that [the habeas court's] failure to review his federal claim

will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451

(2000) (citing *Coleman*, 501 U.S. at 750). This exception, however, is quite narrow; it is

33

"concerned with actual as compared to legal innocence." *Sawyer v. Whitley*, 505 U.S. 333, 339-40 (1992). Thus, to meet this standard, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "The petitioner thus is required to make a stronger showing than that needed to establish prejudice." *Id.* at 327 (citations omitted).[16]

In this case, Petitioner has also failed to show any probability that this Court's failure to review his claim would result in a fundamental miscarriage of justice, as he has offered no new evidence, scientific or otherwise, showing his actual innocence. As Petitioner has not demonstrated that he can overcome the procedural bar to this Court's consideration of his due process claim arising from Venson's testimony, I recommend that this claim be dismissed.[17]

### 3.    Claims 3 and 4:  Challenges to Evidentiary Rulings

Petitioner's third and fourth claims, raised on direct appeal, challenge the trial court's decisions (1) to admit supposedly "unnecessarily excessive" evidence of Petitioner's purported involvement in the drug trade, and (2) to permit the prosecution to ask Petitioner questions, on

---

[16] It is rare that a petitioner will be able to satisfy the actual innocence standard; indeed, "in virtually every case, the allegation of actual innocence has been summarily rejected." *Schlup*, 513 U.S. at 324 (citation omitted).

[17] Because this claim is procedurally barred, this Court need not address its merits. The Court notes, however, that this Court (Patterson, J.) found a nearly identical claim, as raised by Petitioner's co-defendant Martinez, to be meritless, in *Martinez v. Phillips*, 2009 U.S. Dist. LEXIS 34847, at *58, 62-64.

cross examination, about whether he had abused his pregnant girlfriend.[18]  (*See* Direct Appeal Mem., at 49-57.)  Petitioner cannot prevail on either of these claims.

As a threshold matter, mere errors of state evidentiary law are not cognizable on habeas review.  *See* 28 U.S.C. § 2254(a); *see also Estelle v. McGuire*, 502 U.S. at 68.  This Court may only review a state court's evidentiary ruling if it was so egregious that it rendered the petitioner's trial fundamentally unfair, in violation of his constitutional right to due process.  *See Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973); *Rosario v. Kuhlman*, 839 F.2d 918, 924-25 (2d Cir. 1988) ("[E]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus.  Rather, the writ [should] issue *only* where [the] petitioner can show that the error deprived [him] of a *fundamentally fair* trial.") (emphasis in original) (quotation marks and citation omitted); *Schurman v. Leonardo*, 768 F. Supp. 993, 1001 (S.D.N.Y. 1991) (same) (citation omitted); *Copes v. Schriver*, No. 97 Civ. 2284 (JGK), 1997 WL 659096, at *3 (S.D.N.Y. Oct. 22, 1997) (explaining that a habeas petitioner "must demonstrate that the alleged evidentiary error violated an identifiable constitutional right, and, in doing so, a petitioner bears a heavy burden because evidentiary errors generally do not rise to constitutional magnitude") (citation omitted).

Where purportedly prejudicial evidence is "probative of [an] essential element in the case, its admission does not violate the defendant's right to due process."  *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (internal quotation marks and citation omitted).  "For the

---

[18] In asserting these claims on direct appeal, Petitioner cited to the Fifth and 14th Amendments to the United States Constitution, thereby suggesting that these alleged evidentiary errors violated Petitioner's due process right to a fundamentally fair trial.  (*See* Direct Appeal Mem. at 49, 53.)  Thus, these claims appear to be exhausted for the purpose of habeas review; Respondent does not contend otherwise.  (*See* Resp. Mem., at 15-17.)

erroneous admission of other unfairly prejudicial evidence to amount to a denial of due process, the item must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'"   *Id.* (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)).

**a.    Evidence of Petitioner's Prior Involvement in the Drug Trade**

With respect to evidence of Petitioner's prior involvement in the drug trade, it is essentially undisputed that such evidence was probative of an element of the alleged crimes – *i.e.*, the element of identification.  The prosecution sought to prove that, as an associate of Caban and others in the drug trade, Petitioner was involved in Blanding's murder, while Petitioner maintained that he knew Caban only "by face," had never agreed to sell heroin with Caban, and had never met Blanding.  (*See* Direct Appeal Mem., at 22-23.)  As Respondent contends, the evidence of Petitioner's prior involvement in the narcotics trade was "thoroughly interconnected with the testimony of several witnesses, establishing how the witnesses, [P]etitioner, his co-defendants, and Blanding all knew one another, and was thereby relevant and probative in proving the identities of the guilty parties."  (Resp. Mem., at 16.)

Petitioner appears to concede that the evidence of his prior involvement in the drug trade was probative, but he nevertheless contends that the volume of such evidence – "far in excess of what was necessary to [support] the prosecution's theory of the case" – rendered its admission unconstitutional.  (*Id.* at 49.)  This argument fails.  First, much of Petitioner's defense focused on the purported lack of credibility of a number of the prosecution's witnesses, rendering more reasonable the prosecution's approach of introducing cumulative evidence of Petitioner's alleged in involvement in Blanding's murder.  Second, Petitioner points to no clearly established federal

36

law under which probative evidence of uncharged crimes must be limited to "what [is] necessary to [support] the prosecution's theory" (*id.* at 49; *cf. Jones v. Conway*, 442 F. Supp. 2d 113, 131 (S.D.N.Y. 2006) ("[T]he Supreme Court has not held that the use of uncharged crimes would violate the Due Process Clause, [and thus] the Appellate Division's rejection of this claim is hardly either contrary to or an unreasonable application of clearly established Supreme Court law")); indeed, in this case, the Court cannot discern how the duplication or repetition of concededly probative evidence could be said to give rise to a fundamentally unfair trial.  Finally, the trial court in this case *excluded* a good deal of additional evidence about Petitioner's prior drug-dealing, in an apparent effort to limit undue prejudice.  (*See* Resp. Mem. at 16 (citing Trial Tr., at 1231-42, 1341-50).)

In affirming Petitioner's conviction, the Appellate Division held that "[e]vidence of [Petitioner's] extensive involvement in the drug trade was highly probative of motive, was inextricably interwoven with the narrative of events, and was necessary background to explain the relationship among the defendants and their relationship with the victim." *Chebere*, 740 N.Y.S.2d at 26 .  The court further found that the elicited evidence concerning Petitioner's involvement in the drug trade was not "excessive," and that "effort[s] to limit or sanitize this evidence would have unduly restricted its probative value." *Id.*  Viewing Petitioner's trial as a whole, this Court cannot conclude that the Appellate Division's reasoning was contrary to established federal law, or that its decision rejecting Petitioner's claim constituted an unreasonable application of federal law.  Certainly, Petitioner has not demonstrated that the trial court's admission of certain evidence of Petitioner's involvement in the drug trade deprived him of a fundamentally fair trial.

**b.      Cross-Examination of Petitioner Regarding
His Alleged Abuse of His Girlfriend**

Petitioner has likewise failed to demonstrate a basis for disturbing the Appellate

Division's decision, insofar as it rejected Petitioner's due process challenge to the scope of his

cross-examination.  Specifically, the Appellate Division concluded that the "cross-examination

of [Petitioner] concerning his alleged abuse of his girlfriend did not deprive him of a fair trial,"

as that cross-examination "had a good faith basis and was relevant to [Petitioner's] credibility."

*Id.*  The court also noted that Petitioner had answered the prosecution's only questions on that

subject in the negative, and the trial court had then permitted no further inquiry on the topic.  *Id.*

Improper questioning does not violate the federal due process clause unless it is

"'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that

would have existed on the record without it.'"  *Dunnigan*, 137 F.3d at 125 (quoting *Johnson v.

Ross*, 955 F.2d at 181).  In this instance, the prosecution asked Petitioner a total of four questions

regarding whether he had abused his pregnant girlfriend; Petitioner answered the first three

questions in the negative, and the trial court sustained Petitioner's objection to the fourth.  (*See*

Trial Tr. at 1574; Direct Appeal Mem. at 54-55.)  Accordingly, the only testimony the jury heard

was that Petitioner had not abused his pregnant girlfriend.  Such questioning, while potentially

prejudicial, does not appear to have "provide[d] the basis for conviction," nor to have served to

remove a reasonable doubt as to Petitioner's involvement in Blanding's murder.  *See Dunnigan*,

137 F.3d at 125 (internal quotation marks omitted).  This questioning therefore cannot provide

the basis for habeas relief:  the questions did not give rise to a fundamentally unfair trial, and,

accordingly, the Appellate Division did not unreasonably apply clearly established federal law in

upholding the trial court's rulings that allowed the prosecution to ask these questions.

38

For the foregoing reasons, I recommend that the Court dismiss Petitioner's claims challenging the trial court's evidentiary rulings permitting both evidence of Petitioner's alleged prior drug-dealing and cross-examination questions about abuse of his girlfriend.

### 4.   Claim 5:  Trial Court's Limitations on Petitioner's Summation

Petitioner contends that the trial court unjustifiably limited his trial counsel's summation at the close of trial.  During summation, Petitioner's counsel argued that the prosecution's case was "totally lacking integrity," and that the prosecution had been "reckless in their investigation" and presented patently incredible testimony as part of a "shameless desperate search for corroboration where they made deals."  (Trial Tr., at 1720-22.)  Such conduct was, according to Petitioner's counsel's summation, "shameful" and "disgusting."  (*Id.* at 1721-22.)  Following objections by the prosecution, the trial judge directed defense counsel not to "impugn[] the integrity of another attorney or prosecutor."  (*Id.* at 1731.)  The court further stated that defense counsel "can't impugn the D.A.'s office" (*id.* at 1741), and instructed defense counsel to "focus on the evidence, not make it a personal attack [against] the D.A.'s office" (*id.* at 1740).

On direct appeal, the Appellate Division rejected Petitioner's claim regarding the trial court's limitation on Petitioner's summation, concluding that counsel had been "making an argument that was not based on the evidence and amounted to personal attacks on the prosecutor," and further that counsel had "received ample latitude to argue the point he was seeking to advance."  *Chebere*, 740 N.Y.S.2d at 26.  This Court reviews the Appellate Division's rejection of this claim under the standard of review set forth in AEDPA.

The 14th Amendment "require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense," *California v. Trombetta*, 467 U.S. 479, 485 (1984), and a criminal defendant's summation is an essential part of that defense, *see Herring v. New*

*York*, 422 U.S. 853, 862 (1975).  The summation is not evidence, however, *see United States v. Arboleda*, 20 F.3d 58, 61 (2d Cir. 1994), and the trial judge has "broad discretion" to limit both the scope and duration of a criminal defendant's summation:

> The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations.  He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant.  He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial.  In all these respects he must have broad discretion.

*Herring*, 422 U.S. at 862.

In this instance, the trial court's limitation on Petitioner's comments about the District Attorney's office did not violate Petitioner's constitutional rights.  As the Appellate Division concluded, Petitioner "received ample latitude" to question the integrity of the prosecution's case during summation (and throughout trial), and, indeed, the jury heard Petitioner's counsel characterize the prosecution's case as "totally lacking integrity" and the result of a "shameless desperate search."  (Trial Tr., at 1720-22.)  Petitioner was not impeded in any way from attacking the evidence that was actually presented at trial – *e.g.*, the testimony of Venson and Brown – as the trial court's limitation was aimed only at insinuations of prosecutorial misconduct.  Especially in light of the Supreme Court's observation that the trial judge has "great latitude in controlling the duration and limiting the scope of closing summations," *Herring*, 422 U.S. at 862, the Appellate Division's rejection of Petitioner's challenge to the trial court's limitation of his counsel's summation cannot be deemed contrary to, or an unreasonable application of, clearly established federal law.  This claim should therefore be dismissed.

### 5.   Claim 6:  The Trial Court's Alibi Instruction

Petitioner contends that the trial court's jury charge failed to inform the jury of the proper burden of proof regarding Petitioner's alibi defense; according to Petitioner, this purportedly defective jury instruction violated his due process rights.  (*See* Direct Appeal Mem., at 63-66.) As with Petitioner's second claim (his due process claim arising from Venson's allegedly perjured testimony), the state court rejected Petitioner's jury charge claim on the ground that it had not been preserved at trial.  *Chebere*, 740 N.Y.S.2d at 26.  This constitutes an independent and adequate state law ground for the Appellate Division's denial of the claim, precluding review by this Court.  (*See* Discussion Section II(A)(2), *supra*; *Burwell v. Superintendent of Fishkill Corr. Facility*, No. 06 Civ. 787 (JFK), 2008 U.S. Dist. LEXIS 52676, at *19-20 (S.D.N.Y. July 10, 2008) (where Appellate Division had rejected petitioner's jury charge claim as unpreserved, such claim was procedurally barred on habeas review).)  New York courts have consistently held that claims challenging jury instructions must be preserved by specific objections at trial, *see People v. Iannelli*, 69 N.Y.2d 684, 685 (N.Y. 1986); *see also* Resp. Mem., at 23 (citing cases), and the Court discerns no basis for concluding the state's preservation rule was inappropriately applied in this case, *see Cotto*, 331 F.3d at 240.

Petitioner cannot overcome the procedural bar with respect to his jury charge claim.  As with his second claim, discussed above, Petitioner has not shown cause for his failure to preserve his jury charge claim at trial.  He also has not shown any probability that the Court's failure to review his jury charge claim would result in a fundamental miscarriage of justice, as he has offered no new evidence of actual innocence.  Therefore, I recommend that Petitioner's jury charge claim be dismissed.

### 6.      **Claim 7:  Excessive Sentence**

Petitioner argues that his 22-year minimum sentence for second-degree murder was excessive in light of his minor, prior criminal record.  (*See* Direct Appeal Mem., at 67-69.)  The Appellate Division summarily rejected this claim, *see Chebere*, 740 N.Y.S.2d at 26, but, in any event, it is not a cognizable federal claim and should be dismissed here, on that basis.

To the extent this claim may be read to challenge Petitioner's sentence as constituting cruel and unusual punishment under the Eighth Amendment, Petitioner's claim is not cognizable on habeas review.  In order to state a cognizable Eighth Amendment claim, a petitioner must generally allege that the statute under which he was sentenced is itself unconstitutional.  *See United States v. Dawson*, 400 F.2d 194, 200 (2d Cir. 1968) (stating that "when a statute provides for punishment thought to be violative of the [Eighth] [A]mendment the constitutionality of the statute itself must be attacked") (citations omitted).  In this case, Petitioner has made no such attack on the validity of the relevant statute.

In the absence of a challenge to the relevant statute itself, an excessive sentence claim may only be maintained if the sentence imposed fails to comply with state law.  *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law.") (citation omitted).  In this case, Petitioner was convicted of Murder in the Second Degree, pursuant to New York Penal Law § 125.25[1] and [3] , which, by the statute's terms, is a class A-I felony.  The permitted range for a sentence under this statute is 15 to 25 years imprisonment, *see* N.Y. Penal Law § 70.00(3)(a)(i), and Petitioner's sentence falls within this range.  Thus, no Eighth Amendment issue is implicated by Petitioner's sentence, and Petitioner's excessive sentence claim should be dismissed.

B.      **Claims Raised in Petitioner's Section 440 Motion**

1.      **Claim 8:  The Alleged Withholding of *Brady* Material**

For his eighth claim, Petitioner contends that the prosecution committed prosecutorial misconduct by withholding witness cooperation agreements, in contravention of *Brady*.  (*See, e.g.*, Pet. 440 Mtn., ¶¶ 6-7, 11-13, 28.)[19]  The state court, in rejecting Petitioner's original motion to vacate, denied this claim under Section 440.30(4)(d) (*see* 12/19/99 Order, at 2), which provides that the state court may deny a motion to vacate without a hearing if "[a]n allegation of fact essential to support the motion (i) is contradicted by a court record or other official document, or is made solely by the defendant and is unsupported by any other affidavit or evidence, and (ii) under these and all the other circumstances attending the case, there is no reasonable possibility that such allegation is true," N.Y. Crim. Proc. § 440.30(4)(d).  In rejecting both Petitioner's first and second motions to renew, the state court again denied this claim, under Section 2221(e)(2), which provides that a motion for leave to renew must "be based upon new facts not offered on the prior motion that would change the prior determination or shall demonstrate that there has been a change in the law that would change the prior determination," and, in the alternative, under Section 440.30(4)(d).  (*See* Sandusky Aff., Exs. 13, 18.)

Respondent correctly acknowledges that courts in this circuit are split as to whether the state court's denial of a claim under Section 440.30(4)(d), which is arguably a merits-based determination, constitutes an independent and adequate state-law ground for decision, sufficient

---

[19] To the extent Petitioner also intended to raise a claim that the prosecution withheld *Rosario* materials, such a claim cannot be reviewed by this Court.  *Rosario* claims are grounded in state law; as such, they are not cognizable on federal habeas review.  *See Martinez*, 2009 U.S. Dist. LEXIS 34847, at *70 (stating that "the failure to turn over Rosario material is not a basis for [federal] habeas relief, as the Rosario rule is purely one of state law," and dismissing *Rosario* claim).

to bar federal habeas review.  (*See* Resp. Mem., at 31-32 and n.6; *see also, e.g.*, *Washington v. Cuomo*, No. 06 CV 6477 (CBA), 2009 U.S. Dist. LEXIS 97981, at *9-10 (E.D.N.Y. Oct. 19, 2009) (noting split of authority); *Lopez v. Ercole*, No. 09 Civ. 1398 (PAC) (AJP), 2010 U.S. Dist. LEXIS 39274, at *62-66 (S.D.N.Y. Apr. 21, 2010) (Report & Recommendation) (collecting cases).)  Similarly, it is unclear whether a denial under Section 2221(e)(2), which also requires consideration of the merits, constitutes an independent and adequate state law ground. In this instance, however, the Court need not decide whether a denial under either Section 440.30(4)(c) or Section 2221(e)(2) gives rise to a procedural bar, because Petitioner's underlying *Brady* claim fails on the merits, in any event.

It is well established that "the mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief."  *Mallet v. Miller*, 432 F. Supp. 2d 366, 377 (S.D.N.Y. 2006) (citing *Strickler v. Greene*, 527 U.S. 263, 286 (1999)).  Here, Petitioner has not shown that any evidence was actually withheld from him improperly, before trial.  He does argue, however, that certain statements made in response to his FOIL requests, as well as other circumstantial evidence, suggest that the prosecution concealed a cooperation agreement with Quinones.  In particular, Petitioner argues that the existence of documents reflecting "interviews" with Quinones and "deals" made with him – as described in Justice Ruiz's November 22, 2004 Order – demonstrate that such documents were improperly withheld in contravention of *Brady*. (Pet. 440 Mtn., ¶¶ 56-71 (citing 11/22/04 Order.))  Arguments nearly identical to these were raised by Petitioner's co-defendant Martinez, in support of his nearly identical *Brady* claim.  *See* *Martinez*, 2009 U.S. Dist. LEXIS 34847, at *70-83.  In a well-reasoned analysis, the Court (Patterson, J.) dismissed Martinez's *Brady* claim, and, for the reasons set forth below, the Court should follow Judge Patterson's analysis and dismiss Petitioner's *Brady* claim, as well.

44

Martinez, like Petitioner, argued that the prosecutors had violated *Brady* by failing to turn over documents and statements concerning Quinones.  *Id.* at *70.  To support this claim, Martinez pointed to Justice Ruiz's finding, in his Order dated November 22, 2004, that the government "acknowledges notes taken during interviews of Quinones . . . [which] refer to the witness Quinones and reports generated through interrogation of, or 'deals' made, with him."  *Id.* at *76-77 (quoting 11/22/04 Order).  Martinez argued that this finding evinced a *Brady* violation in two ways.  First, Martinez claimed that he received only one interview of Quinones, but Justice Ruiz's use of the plural "interviews" made clear that there was more than one interview. *Id.* at *77.  The factual record before Judge Patterson indicated, however, that two transcribed interviews of Quinones were disclosed to Martinez – and to Petitioner – before trial.  *Id.* Second, Martinez argued that Justice Ruiz's reference to "deals" demonstrated that there had been a deal between prosecutors and Quinones to secure Quinones's testimony against Martinez and/or Petitioner.  *Id.* at *78-79.  Judge Patterson rejected this argument, as the record reflected two *other* deals Quinones had made – one related to a September 12, 1993 murder, and another related to a January 1996 narcotics sale.  *Id.*  Thus, Judge Patterson concluded, Justice Ruiz's reference to "deals" did not suggest that Quinones had made a deal to testify against Martinez. *Id.* at *79.  Rather, as Judge Patterson explained, Quinones's criminal history suggested that "the prosecution had nothing to give Quinones in return for his testimony at the time of [Martinez's and Petitioner's] trial . . . , so the likelihood of a plea agreement involving his testimony in this case is nil."  *Id.* at *79-80.

Martinez also argued that the "suspicious cell transfers" of Petitioner and Quinones at the Bronx House of Detention should have resulted in documents being generated, and that such documents had been improperly withheld.  *Id.* at *81-82.  Judge Patterson found this "sheer

45

speculation" insufficient to support a Brady claim.  *Id.* at *81-82 (citing *United States v. Upon*, 856 F. Supp. 727, 746 (E.D.N.Y. 1994); *Mallet v. Miller*, 432 F. Supp. 2d 366 (S.D.N.Y. 2006).) Finally, Judge Patterson rejected a laundry list of other "reasons" to believe, according to Martinez, that the prosecution had withheld exculpatory material concerning Quinones's testimony, *see id.* at *80-81 n.8,[20] on the ground that none of these reasons "provide[d] a basis for a plausible showing that [the government] suppressed a cooperation agreement."  *Id.*

Petitioner's arguments, by and large, mirror those of Martinez, and should be rejected for the same reasons.  The Court has also conducted an independent *in camera* review of the materials that were responsive to Petitioner's two FOIL requests, but were withheld by the DA's office (*see* Background Section I, *supra*), and finds that none of those documents should have been produced under *Brady,* nor do any of the documents suggest that any additional *Brady* material was withheld.  For these reasons, Petitioner's *Brady* claim fails.

### 2.  Claim 9:  Prosecutorial Misconduct for Eliciting of Allegedly False Testimony

Petitioner also raised his ninth claim, that the prosecution elicited false testimony from one or more cooperating witnesses, in his Section 440 motion, and, as with Petitioner's eighth

---

[20] The reasons set forth by Martinez included:  "1) Respondent's responses to his and co-defendant Chebere's FOIL requests, in which Respondent allegedly admitted that it withheld documents; 2) the prosecutor's alleged threats to force Quinones to testify in the Arthur Massey case (which did not involve Petitioner), the Michael Smith attempted murder and robbery case in which Petitioner was convicted, and the instant case; 3) the prosecutor's alleged threats to Juan Ortiz, not a witness in this case, to testify falsely against Louis Bracero for the murder of German Morales (a completely unrelated matter); 4) the prosecutor's alleged dismissal from her job at Respondent's office for impeding a criminal investigation; 5) Respondent's alleged history of engaging in prosecutorial misconduct; 6) Quinones' allegedly unclear answer to a question at trial; 7) Quinones' trial testimony that he would lie to get out of jail, 8) the lack of questioning of police detectives about Quinones, 9) Quinones' placement into a jail cell next to Chebere, and 10) the lack of an adequate trial record concerning *Rosario* issues."  *Id.* at *80-81 n.8.

claim, the state court rejected this claim under Section 440.30(4)(d).  (*See* 12/19/99 Order)  Once again, however, the Court need not decide whether the state court's denial of this claim under Section 440.30(4)(c) gives rise to a procedural bar, as Petitioner's underlying claim, in any event, lacks merit.

Petitioner maintains that the prosecution "sat by silently" while "informant witnesses," presumably including Quinones, falsely testified that they received no "promises" or compensation in return for their trial testimony against Petitioner; according to Petitioner, the prosecution should have corrected this false testimony.[21]  (*See* Pet. 440 Mtn., ¶ 7.)  Yet a key logical requirement of Petitioner's claim is that the purported cooperating witnesses's testimony was actually false.  If the testimony was *not* false, then the prosecution was clearly under no obligation to correct it.  Because, as noted above (*see* Discussion Section II(B)(1), *supra*), Petitioner has failed to demonstrate that Quinones in fact had a cooperation agreement with the government with respect to Petitioner's case, the state court's rejection of Petitioner's claim of prosecutorial misconduct was neither contrary to, nor an unreasonable application of, established federal law.  Accordingly, I recommend that this claim be dismissed.

### 3.    Claim 10:  Ineffective Assistance of Trial Counsel for Failure To Conduct an Adequate Investigation

Petitioner claims that he was deprived of the effective assistance of trial counsel by his counsel's supposed failure to investigate the crime scene and to interview certain witnesses prior to trial.  (*See* Pet. 440 Mtn., ¶¶ 17-28.)  In his Section 440 motion to vacate, Petitioner argued, in

---

[21] Although Petitioner's initial Section 440 motion does not specifically name these "informant witnesses" (*see generally* Pet. 440 Mtn.), Petitioner's Motion to Renew the Section 440 Motion suggests that one of these witnesses is Quinones (*see* Sandusky Aff., Ex. 15 (Notice of Motion), ¶¶ 3-21).

particular, that his trial counsel's performance was constitutionally inadequate because trial counsel did not consult with Petitioner until two days before trial, failed to "visit the scene of the crime and interview[] witnesses and alibi witnesses," "refused to take heed" of the fact that an informant (*i.e.*, Quinones) had been placed in the cell next to Petitioner's at the Bronx House of Detention, and "refused to investigate" Quinones's role.  (*See* Pet. 440 Mtn., ¶¶ 20, 21, 24.)

The state court, in rejecting Petitioner's motion to vacate, denied this claim under Section 440.30(4)(d).  (*See* 12/19/99 Order)  The court rejected Petitioner's allegation that trial counsel did not consult with Petitioner until two days before trial; to the contrary, the court noted that Petitioner's counsel had appeared at several lengthy pre-trial conferences and hearings, and that counsel's "comprehensive understanding of the case" during those pre-trial proceedings made it "obvious that [counsel] had already met and extensively conferred with his client to prepare a defense."  (*Id.* at 3.)  Furthermore, the court found that, at trial, "counsel had a coherent strategy, made cogent legal arguments and competently cross examined each of the prosecution witnesses."  (*Id.*)  The court noted that counsel did in fact present an alibi defense at trial, and that Petitioner had not identified any *other* alibi witnesses that should have been called. (*See id.* at 3-4.)  The Court also found no reason to fault counsel for failing to visit the crime scene, as Petitioner had shown no reason why such a visit would have been relevant to his defense.  (*See id.* at 4.)

As with Petitioner's eight and ninth claims (*see* Discussion Sections II(B)(1)(2), *supra*), the Court need not decide whether this denial under Section 440.30(4)(c) gives rise to a procedural bar, because, as set forth below, the state's court rejection of that claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

48

### a.    Counsel's Alleged Failure to Consult with Petitioner Until Two Days Before Trial

The right to counsel in criminal prosecutions is grounded in the Sixth Amendment. Because the Constitution "envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results[,] . . . 'the right to counsel is the right to the effective assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).  Counsel can deprive a criminal defendant of this right "simply by failing to render 'adequate legal assistance.'"  *Id*. at 686 (citation omitted).

In order for counsel to be deemed constitutionally "ineffective," however, counsel's conduct must have "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id*.  Petitioner can demonstrate such ineffectiveness by showing both that:  (1) his counsel's performance was deficient to such a degree that the "representation fell below an objective standard of reasonableness," *id*. at 688, and (2) this deficient performance prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694.  The Court may reject an ineffective assistance of counsel claim for failure to satisfy either of these prongs of the *Strickland* standard, without reaching the other. *See id*. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Petitioner's claim that his counsel failed to meet with him until two days before trial is contradicted by the state court's factual findings, which are presumed correct in the absence of clear and convincing evidence to the contrary.  *See* 28 U.S.C. § 2254(e)(1).  The state court's

rejection of this claim was based on the court's own assessment of counsel's preparation for proceedings that took place weeks before trial; the court concluded, from its observation of counsel's performance at those proceedings, that it was "obvious" that counsel had conferred with Petitioner well before trial in order to plan an adequate defense.  (*See* 12/19/99 Order, at 3.) Petitioner has come forward with no evidence to contradict that finding, much less "clear and convincing" evidence.  The Court should therefore defer to the state court's factual findings and reject Petitioner's contention that counsel did not meet with Petitioner sufficiently in advance of trial.

### b.     Counsel's Alleged Failure To Visit the Crime Scene

The state court also properly rejected Petitioner's claim that his counsel's failure to visit the crime scene rendered his performance constitutionally ineffective.  As the state court concluded, Petitioner made no showing that a visit by counsel to the crime scene could, in any way, have helped counsel to prepare Petitioner's defense, which was based on a purported alibi. In other words, there is no reasonable probability that a visit to the crime scene, years after Blanding's killing, would have had any impact on outcome of Petitioner's trial.  *See Strickland*, 466 U.S. at 694.  Thus, to the extent Petitioner's ineffective assistance claim rests upon counsel's purported failure to visit the crime scene, the claim should be dismissed.

### c.     Counsel's Alleged Failure To Interview Witnesses

Petitioner further claims that his counsel failed to interview witnesses prior to trial, including Diaz and unspecified alibi witnesses.  (*See* Pet. 440 Mtn., ¶¶ 20, 24-25.) Petitioner offers no affidavits from these witnesses, or any other proof as to how they would have testified. Nonetheless, he contends that Diaz would have provided sworn testimony that Quinones was an

informant who had been planted by the District Attorney next to Petitioner's cell.  (*See id.* ¶ 24.)
This is insufficient to demonstrate ineffective assistance of counsel.

"[A]ctions or omissions [by counsel] that 'might be considered sound trial strategy' do
not constitute ineffective assistance."  *United States v. Berkovich*, 168 F.3d 64, 67 (2d. Cir.
1999) (quoting *Strickland*, 466 U.S. at 689).  Moreover, there is a "strong presumption that
counsel's conduct falls within the wide range of reasonable professional assistance" and
Petitioner "must overcome the presumption" that counsel's action may have been trial strategy.
*Strickland*, 466 U.S. at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  "Counsel's
decision to interview witnesses is a strategic decision."  *Byas v. Keane*, No. 97 Civ. 2789, 1999
U.S. Dist. LEXIS 12315, at *18 (S.D.N.Y. Aug. 12, 1999); *accord Lamorte v. United States*, 73
F. Supp. 2d 406, 409 (S.D.N.Y. 1999).  Similarly, the "decision to call or bypass particular
witnesses is peculiarly a question of trial strategy which courts will practically never second-
guess" in considering an allegation of ineffective assistance of counsel.  *United States ex rel.
Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir. 1974) (internal citation omitted); *accord
United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998).

Without any evidence to the contrary, the Court must presume that Petitioner's counsel
chose for strategic reasons not to interview or call certain witnesses identified by Petitioner.  In
particular, counsel may have decided not to pursue and present testimony from Diaz because,
despite Petitioner's conclusory assertions as to Diaz's belief that Quinones was cooperating with
the government, there was little reason to believe, at the time of trial, that Diaz actually had
knowledge of Quinone's status.  In this regard, the Court notes that Petitioner has not provided
any particular basis for Diaz's supposed belief that Quinones was an "informant," nor has he
submitted to the Court any affidavit from Diaz which would allow the Court to ascertain the

potential strength of Diaz's hypothetical testimony.  Further, the fact that Petitioner's counsel

interviewed Diaz after trial and yet filed no post-verdict motion based upon that interview (*see*

12/19/99 Order, at 2-3) suggests that the interview did *not* yield helpful information, and, thus,

that counsel's course of action, prior to that time, was objectively reasonable.  In sum, because

counsel's decision not to interview Diaz prior to trial or call him at trial may have been strategic,

and because Petitioner has offered no basis for overcoming the "strong presumption" in

counsel's favor, it cannot be said that counsel's conduct was objectively unreasonable.

    Moreover, even apart from the question of whether Petitioner's counsel acted

unreasonably in failing to interview Diaz, Petitioner also cannot show that he suffered prejudice

from his counsel's failure to conduct that interview, or the interview of any other potential

witness.  Petitioner has submitted nothing but his own bare assertions as to how the witnesses

would have testified, which is not enough to demonstrate the likelihood that their testimony

would have altered the verdict.  *See Parker v. Ercole,* 582 F. Supp. 2d 273, 294-96 (N.D.N.Y.

2008) (rejecting ineffective assistance of counsel claim based on a failure to call a witness where

"[t]he only support for petitioner's claim regarding what his testimony—and that of [the uncalled

witness] would have been—is his own self-serving statement")*.*  Indeed, even if Diaz's

testimony could have been used to impeach Quinones's credibility, Petitioner cannot establish

that there is a reasonable probability that such testimony would have affected the trial's outcome.

*See United States v. Pagan*, 829 F. Supp. 88, 92 (S.D.N.Y. 1993) (cumulative impeachment

material was not reasonably likely to alter the verdict), *aff'd*, 28 F.3d 102 (Table) (2d Cir. 1994).

Importantly, Quinones was not the only witness to testify against Petitioner at trial, so that, even

if the jury had entirely discredited his testimony, sufficient evidence would have remained to

support Petitioner's conviction.  *See Edwards v. Jones*, 720 F.2d 751, 755 (2d Cir. 1983)

("'[T]he testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction.'") (quoting *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979)).

Petitioner's attempt to fault his counsel for failing to interview additional alibi witnesses fails for similar reasons. Petitioner has not identified any particular alibi witnesses whom counsel failed to interview, nor has Petitioner provided any evidence of the testimony that such witnesses would have offered. In the absence of such evidence, Petitioner cannot demonstrate any likelihood that the unidentified witnesses' testimony would have altered the verdict. Thus, to the extent that Petitioner claims that his counsel's failure to interview witnesses rendered counsel's performance constitutionally ineffective, Petitioner's claim should be dismissed.

### d.      Counsel's Failure To Investigate the "Quinones Matter"

As discussed above, Petitioner claims that Diaz would have testified that Quinones was a government informant, and, accordingly, Petitioner faults his trial counsel for failing to elicit this testimony from Diaz at trial. (*See* Discussion Section II(A)(3)(c), *supra*.) Likewise, Petitioner contends that his trial counsel should have directly investigated the Quinones matter prior to trial, and claims that counsel's failure to do so rendered his performance constitutionally ineffective. (*See* Pet. 440 Mtn., ¶¶ 20-21.) Petitioner claims that he told his trial counsel to investigate Quinones based upon information Petitioner had received from Diaz, but, according to Petitioner, his trial counsel refused to undertake that investigation. (*See id.*)

Petitioner's allegations about trial counsel's failure to investigate Quinones do not establish a claim for ineffective assistance of counsel. As set forth above, in support of his theory that Quinones was a government informant, Petitioner offers nothing more than his own assertions that Quinones was in the cell next to his at the Bronx House of Detention and that Diaz and others had told him that Quinones was a government informant. (*See* Section

II(B)(3)(c), *supra*.)  Even assuming, as Petitioner contends, that his counsel failed to conduct any investigation based on these assertions, Petitioner has failed to offer any evidence to suggest that further investigation would have revealed that Quinones was, in fact, a government informant, let alone that the result of his trial would have been different had this fact come to light.  *See Bingham v. Duncan*, No. 01 Civ. 1371 (LTS), 2002 U.S. Dist. LEXIS 26445, at *10 (S.D.N.Y. June 12, 2003) ("[P]etitioner's conclusory allegations regarding trial counsel's failure to do investigative work and to contact potential witnesses do not establish that the result of the proceedings would have been different if not for counsel's error – or even that his behavior was erroneous at all.").

For all the foregoing reasons, I recommend that the Court dismiss Petitioner's ineffective assistance of counsel claim.

### 4.    Claim 11:  Double Jeopardy

Petitioner's 11th claim, seemingly based on the double jeopardy clause of the Fifth Amendment, should also be dismissed.  Petitioner raised this claim in one of his motions to renew his Section 440 motion (*see* Background Section G, *supra*), arguing that the prosecution's misconduct at his trial would preclude the government from retrying his case, should he receive relief from the judgment of conviction.  Petitioner, however, does not presently face a second trial for his alleged involvement in Blanding's death, and, for the reasons discussed herein, this Court does not recommend that any new trial be ordered.  Accordingly, in the present posture of this case, there is no basis for this Court to consider the constitutional propriety of a second trial.[22]

---

[22] The Court notes that, even if Petitioner were to be awarded a new trial, double jeopardy protections would not be implicated in the manner he suggests.  *See United States v. Pavloyianis*,

C.   **Newly Added Claims**

Petitioner's remaining claims, though unexhausted (*see* Discussion Section I(B), *supra*),

should nonetheless be dismissed for lack of merit, as set forth below.

1.   **Claim 12:  Alleged Denial of Due Process Rights in Connection with Efforts to Obtain Purported *Brady* Material**

Petitioner claims that the trial court's failure to conduct an *in camera* inspection of the

prosecution's files violated his right to due process.  (Sandusky Aff., Ex. 19 (Affirmation in

Support Motion to Amend FRCP Rule 15d, dated Nov. 5, 2007 ("Affirm. Supp. Mtn.") ), at 19.)

As noted above, this claim is unexhausted (*see* Discussion Section I(B), *supra*), but should be

rejected on the merits.

As the Supreme Court explained in *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987):

> In the typical case where a defendant makes only a general request
> for exculpatory material under [*Brady*], it is the State that decides
> which information must be disclosed.  Unless defense counsel
> becomes aware that other exculpatory evidence was withheld and
> brings it to the court's attention, the prosecutor's decision on
> disclosure is final.  Defense counsel has no constitutional right to
> conduct his own search of the State's files to argue relevance.

*Id.* at 59.  Where, however, a defendant has requested particular state files and has established a

basis for a claim that those files contain material evidence, the trial court should review the files

*in camera* and release to the defendant evidence deemed material.  *See id.* at 58 n.15 (noting that

a defendant may not require a court to review confidential records *in camera* "without first

establishing a basis for his claim that it contains material evidence"); *United States v. Leung*, 40

F.3d 577, 582-83 n.1 (2d Cir.1994) (citing *Ritchie* for the proposition that "*in camera* review

---

996 F.2d 1467, 1473 (2d Cir. 1993) (stating that generally, "the Double Jeopardy safeguard does
not prevent retrial of a defendant who obtains a reversal of his conviction because of an error or
defect in the criminal proceedings leading to conviction").

should not be required," unless the defense first establishes a basis for a claim that the files in question contain material evidence); *see also United States v. Kiszewski*, 877 F.2d 210, 216 (2d Cir. 1989) (finding that it was "error for the district court to refuse to compel production of [a cooperating witness's] personnel file for *in camera* inspection based solely on the representations of the government").

As an initial matter, there was little, if any, evidence in the record at the time of trial that would have provided a basis for Petitioner's claim that the prosecution was withholding material evidence, and, thus, the trial court cannot be faulted for failing to conduct an *in camera* review of all of the prosecution's files.  In any event, this Court has now reviewed Petitioner's supposed evidence that documents were withheld from him improperly and has conducted an *in camera* review of the documents that the prosecution has continued to withhold.  As explained above, the Court has not found any exculpatory evidence, nor anything to suggest that exculpatory evidence was ever withheld.  (*See* Discussion Section II(B)(1), *supra*.)  Because Petitioner cannot show that any exculpatory evidence would have been disclosed, had the trial court conducted an *in camera* review, the trial court's failure to do so was harmless, and, thus, Petitioner's due process claim should be rejected.  *See Ritchie*, 480 U.S. at 58 (noting that, where trial court failed to conduct an *in camera* review of certain confidential documents, the conviction would stand if subsequent review revealed that "the nondisclosure was harmless beyond a reasonable doubt"); *Kiszewski*, 877 F.2d at 216 (directing "the district court to conduct an *in camera* examination of the file to determine whether information in the file should have been disclosed and, if so, whether [the defendant] [wa]s entitled to a new trial, or whether 'nondisclosure was harmless beyond a reasonable doubt'") (quoting *Ritchie*, 480 U.S. at 58).

2.      **Claim 13:  Ineffective Assistance of Counsel Based Upon Failure
To Explore the Circumstances Surrounding Quinones's Testimony**

In his 13th claim, as raised in Petitioner's motion to amend in this habeas proceeding,

Petitioner argues that was denied the effective assistance of counsel when his trial counsel failed

"to fully explore the circumstances [under which] Quinones testified."  (Affirm. Supp. Mtn.,

at 34-39.)  This claim is, to some degree, duplicative of Petitioner's 10th claim, in which he

faults trial counsel for failing to investigate the crime scene and interview witnesses –

particularly with respect to the "Quinones . . . matter" (Pet. 440 Mtn., ¶ 21) – prior to trial.  To

the extent that Petitioner's 13th claim is based on trial counsel's purported failure to investigate,

prior to trial, the circumstances surrounding Quinones' testimony against Petitioner, such a claim

was already raised before the state court in Petitioner's Section 440 motion to vacate, and, as

discussed above (*see* Discussion Section II(B)(3)(d), *supra*), it should be dismissed on the merits

because the state court's rejection of such a claim was neither contrary to, nor an unreasonable

application of, clearly established federal law.

To the extent, however, that Petitioner's 13th claim challenges (1) trial counsel's failure

to subpoena certain documents and request *in camera* review of documents withheld by the

prosecution; and (2) the adequacy of counsel's cross-examination of Quinones at trial,

Petitioner's claim is unexhausted, as it has not been raised in the state courts.  (*see* Discussion

Section I(B), *supra*.)  Nevertheless, it should be denied on the merits, on *de novo* review.

As explained above (*see* Discussion Section II(C)(1), *supra*), Petitioner has failed to

demonstrate the existence of material evidence that was not disclosed prior to his trial.

Petitioner's counsel cannot be faulted for failing to obtain documents that Petitioner has not

shown existed.  Nor has Petitioner demonstrated that the result of his trial would have been any

different had his counsel made further efforts to obtain additional evidence, whether by subpoena or by requesting *in camera* review of any withheld documents.  *See United States v. Nersesian*, 824 F.2d 1294, 1322 (2d Cir. 1987) ("Counsel certainly is not required to engage in the filing of futile or frivolous motions.").

With respect to Petitioner's counsel's cross-examination of Quinones, "[d]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature." *Id.* at 1321.  Here, Petitioner's counsel engaged in a vigorous cross-examination (and re-cross) of Quinones.  For example, counsel highlighted Quinones's criminal record (*see* Trial Tr., at 1354-59), and elicited admissions that Quinones had falsely told an attorney that he had been harassed and threatened by a prosecutor (*see id*. at 1364-69), that Quinones had only agreed to testify for the prosecution in an unrelated case in exchange for a cooperation agreement in that case (*see id*. at 1373-79), that Quinones' pre-trial statements to the prosecution and trial testimony in that unrelated case had been inconsistent (*see id*. at 1390-95), and that he would lie under some circumstances, particularly if he or his family were threatened (*see id*. at 1384).  As, even now, there is no evidence that Quinones was a cooperating witness in connection with this case, Petitioner's counsel was not ineffective, under *Strickland*, for failing to pursue this matter on cross-examination.   Accordingly, Petitioner's 13th claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Petitioner's Amended Petition should be dismissed in its entirety.  I further recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

Loretta A. Preska, United States Courthouse, 500 Pearl Street, Room 1320, New York, New

York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street,

Room 525, New York, New York 10007.  Any requests for an extension of time for filing

objections must be directed to Judge Preska.  FAILURE TO FILE OBJECTIONS WITHIN

FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL

PRECLUDE APPELLATE REVIEW.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-*

*CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d

298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v.*

*Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).  If Petitioner does not have access to cases cited

herein that are reported only on LEXIS or Westlaw, he may request copies from Respondents'

counsel.  *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with

copies of [cases and other authorities cited therein that are unpublished or reported exclusively

on computerized databases] as are cited in a decision of the Court and were not previously cited

by any party.").

Dated:  New York, New York
        November 1, 2011

                                    SO ORDERED


                                    _____
                                    DEBRA FREEMAN
                                    United States Magistrate Judge


Copies to:

Hon. Loretta A. Preska, U.S.D.J.

Mr. Hector Chebere
# 99-A-2842
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY  12582

Karen Swiger, Esq.
Robert R. Sandusky, III, Esq.
Office of District Attorney, Bronx County
198 East 161st Street
Bronx, NY  10451